# ARKANSAS DEPARTMENT of HUMAN SERVICES *v.* Joyce COX

01-1021 82 S.W.3d 806

Supreme Court of Arkansas
Opinion delivered June 6, 2002

[Petition for rehearing denied July 11, 2002.*]

---

\* GLAZE and IMBER, JJ., would grant.

*Dana McClain,* for appellant.

*Stacey Bryant Ryall, P.A.,* by: *Stacey D. Ryall,* for appellee.

JIM HANNAH, Justice. The Arkansas Department of Human Services (DHS) appeals orders of the Greene County Probate Court, a temporary guardianship order entered May 16, 2001, a permanent guardianship order entered May 21, 2001, and a September 19, 2001, order. DHS asserts that this case is controlled by the Uniform Child Custody Jurisdiction Enforcement Act (UCCJEA), codified at Ark. Code Ann. §§ 9-19-101—9-19-401

(Repl. 2002), and that the probate court lacked jurisdiction under the Uniform Act to decide the issue of guardianship, or in the alternative, abused its discretion in failing to decline jurisdiction by reason of conduct under Ark. Code Ann. § 9-19-208. DHS also asserts that the probate court erred when it failed to give full faith and credit to an order from a Florida court to pick up the child.

We hold that the probate court had jurisdiction to consider the guardianship petition. We further hold that the Florida *ex parte* order at issue was void *ab initio* and invalid on its face. We also hold that even had the Florida *ex parte* order been valid, it was not entitled to full faith and credit in that it was never registered or enforced in this state as required under the UCCJEA, and that DHS was without authority to take any action whatever on the order. The decision of the probate court is affirmed.

*Facts*

This case involves the seizure of a child by DHS without a warrant or order of any court of this state. DHS does not assert that the child was in immediate danger such that they were required to take custody without a warrant or order as allowed under the statutes of this state. In fact, DHS denies taking the child into DHS custody, but rather asserts that the child was taken and held by them in Arkansas under the authority of an *ex parte* order of the State of Florida. DHS relies on an *ex parte* "Order to Take-Into-Custody" issued by the Circuit Court of Osceloa County Florida, which was directed to "All and Singular the Sheriff's of the State of Florida or Other Law Enforcement Agencies." The Arkansas Department of Human Services was not mentioned in this order.

DHS does not assert that this *ex parte* order from Florida was registered or that enforcement of the order was sought in the courts of this state under the UCCJEA. No notice was provided to Joyce Cox, who was caring for the child. No warrant to take custody was issued by a court of this state under the UCCJEA. DHS simply went to the house and took the child.

According to the testimony of Suzanne Henry, a supervisor for the Department of Human Services, Children and Family Ser-

vices in Greene County, on May 15 she received a call from her superiors at DHS directing her to. "pick up a child" and "hold" her for the State of Florida. Ms. Henry expressed concern about taking custody of the child without a court order, and eventually, the Florida *ex parte* order was faxed to Ms. Henry. Ms. Henry then forwarded the Florida order to Lisa McGee, Deputy Counsel at the Office of Chief Counsel at DHS, for confirmation. According to Ms. Henry's testimony, she received a call back and was told to "honor" the Florida order and to "pick-up the child and hold until Florida could pick the child up." According to DHS's pleadings, Lisa McGee directly told Ms. Henry to "take custody" of the child. Ms. Henry also testified that when she was speaking with authorities in Florida they told her that if DHS would pick up the child they "would be on the plane immediately."

Ms. Henry then proceeded to the Cox home on May 15 where Cheyenne was in the physical custody of her paternal grandmother, Joyce Cox. Ms. Henry testified that no notice had been provided to Ms. Cox, and that they simply took the child. Ms. Henry also testified that "when I arrived to pick up the baby she was not in any danger. She was clean, and she looked fine. The room she stayed in was clean." Ms. Henry further testified that on May 16 she informed authorities in Florida that they had Cheyenne.

On May 16, Ms. Cox filed a Petition to Appoint Guardian of Minor Child, which was considered *ex parte* and resulted in an *Ex Parte* Temporary Order of Guardianship granted that day. On May 17, the Temporary Order of Guardianship was faxed to Christine Berger, counsel for DHS. By this order, Ms. Berger and DHS were informed that DHS was ordered "to return the incapacitated person to the physical custody of the petitioner, Joyce Cox, immediately and without delay." DHS did not return the child to Ms. Cox. Ms. Berger and DHS were further given notice in this order that a temporary hearing was to be held the next day at 9:30 a.m.

DHS decided not to comply with the probate court's order and contacted Florida. They delivered Cheyenne to Florida

authorities at the Memphis airport on the morning of the hearing such that by the time of the hearing, Cheyenne was out of the State of Arkansas. DHS asserts this case involves a race to the courthouse and because the Florida *ex parte* order was issued on May 15, and the Arkansas order on May 16, that they decided to follow the earlier Florida *ex parte* order.

DHS asserts further that what occurred in this case is simply a matter for the Florida courts because it arose when a pregnant woman fled Florida to Arkansas to give birth here for the express purpose of depriving Florida of jurisdiction of her child because Florida was about to terminate her parental rights to her other five children in Florida. DHS also asserts that Florida has a pending dependency–neglect proceeding on the family in Florida and has worked with this family since the late 1990s. Therefore, DHS asserts, Florida has interests that should be protected, and Cheyenne can be best served by the Florida courts.

### Standard of Review

We review probate proceedings de novo, and we will not reverse the decision of the probate court unless it is clearly erroneous. *Dillard v. Nix*, 345 Ark. 215, 45 S.W.3d 359 (2001); *Amant v. Callahan*, 341 Ark. 857, 20 S.W.3d 896 (2000). When reviewing the proceedings, we give due regard to the opportunity and superior position of the probate judge to determine the credibility of the witnesses. *Id.*

### Jurisdiction Under the UCCJEA

DHS asserts that the probate court lacked jurisdiction to entertain the guardianship petition because Florida already had jurisdiction of the Pruitt family. The Florida circuit court had dependency–neglect proceedings pending before it with respect to each of Cheyenne's five siblings who resided in Florida. DHS also argues that proceedings specifically concerning Cheyenne had already been commenced in Florida prior to May 16, 2001, when the probate court issued its order, and that the probate court should have, therefore, deferred to Florida. DHS argues that deference to Florida was especially proper in this case where Florida

was already involved with the family, and where the mother only came to Arkansas to give birth to Cheyenne in order to deprive Florida of jurisdiction. The May 15, 2001, *ex parte* "Order to Take-Into-Custody" issued by the Florida circuit court shows Florida was attempting to exert some manner of jurisdiction over Cheyenne prior to May 16, 2001, when the probate court issued its *Ex Parte* Temporary Order of Guardianship.

DHS asserts that under the UCCJEA, Florida had jurisdiction. We also note that the Parental Kidnapping Prevention Act, 28 U.S.C. 1738A (2002), is applicable and where conflicts exist is preemptive. *Perez v. Tanner*, 332 Ark. 356, 965 S.W.2d 90 (1998). This was also DHS's argument in its motion to dismiss filed in probate court, and the issue of the validity of the Florida *ex parte* order was litigated below. Cox specifically asserted the Florida *ex parte* order was void *ab initio*. As DHS correctly states in its brief, the issue in this case is whether the probate court had jurisdiction to decide custody. The dissent confuses the issue by mistakenly analyzing this case under principles of significant connection that were modified by adoption of the UCCJEA.[1]

The UCCJEA as codified in Arkansas is comprised of three subchapters. Subchapter one provides general provisions, including definitions. Subchapter two sets out jurisdiction and the method whereby the courts of this state issue a child-custody determination order. Section 9-19-201 provides the criteria used to determine whether a state has jurisdiction to make an "initial child-custody determination." "Initial determination" means the first child-custody determination. Ark. Code Ann. § 9-19-102(8)

---

[1] The dissent fails to consider that under the UCCJEA, no child-custody determination order may be enforced in a foreign state if there was no notice and an opportunity to be heard when the child-custody determination order was issued in the rendering state, and that under the UCCJEA, notice and an opportunity to be heard must be provided in the foreign state before the child may be removed from its home under a foreign child-custody determination order. The UCCJEA streamlines the process of obtaining enforcement of child-custody determinations in foreign states, but it does not dispense with due process. The dissent focuses upon significant connections, and cites to cases under the old UCCJA, failing to recognize that the changes in the UCCJEA focusing on home state as the primary determiner of jurisdiction encourages cooperation between sister states and reduces jurisdictional contests.

(Repl. 2002). Under § 9-19-201(a) as applied to the facts of this case, a court of this state has jurisdiction to make an initial child-custody determination if it is the home state of the child. The home state of a child of less than six months of age means the state in which the child lived from birth with a parent or person acting as a parent. Ark. Code Ann. § 9-19-102(7). *See similarly*, 28 U.S.C. 1738A(a)(4) under the PKPA. DHS agrees that under this definition, Arkansas is the home state, but argues that this Court must look at more than just whether Arkansas is the "home state." DHS also argues conversely that Florida had jurisdiction and under the PKPA, once jurisdiction was had in Florida, the Arkansas court was without jurisdiction to act, because, as stated, that act is preemptive. As noted, the definition of "home state" is the same in PKPA as in the UCCJEA. Contrary to what DHS argues, Florida never had jurisdiction under the PKPA or under the UCCJEA to make a child-custody determination and, therefore, there was no jurisdiction in Florida on May 16, 2001, when the probate court acted.

DHS argues further and separately that a proceeding could not be commenced here because a proceeding regarding Cheyenne had already been commenced in Florida as evidenced by the existing dependency-neglect proceedings on Cheyenne's siblings in Florida and based upon the May 15, 2001, *ex parte* "Order to Take-Into-Custody" of the Florida circuit court.

We will consider first the argument that the existing dependency-neglect proceedings in Florida somehow encompassed Cheyenne. It is true that if Florida had somehow had jurisdiction to make a child-custody determination before the probate court did, then there would be exclusive continuing jurisdiction subject only to temporary emergency jurisdiction in this state. Ark. Code Ann. § 9-19-202—9-19-204 (Repl. 2002). This illuminates some of the changes made in the UCCJEA to resolve concerns raised under the old Uniform Child Custody Jurisdiction Act (UCCJA), formerly Ark. Code Ann. § 9-13-201—9-13-208 (Repl. 2002). Under the old UCCJA, there was a temptation to apply a significant-connection analysis in an attempt to override the "home state" analysis and secure jurisdiction.

> Since passage of the Parental Kidnaping Prevention Act of 1980 use of significant connection jurisdiction is limited to three primary circumstances: (1) in initial custody determinations when the child has no home state; (2) when a court with home state jurisdiction has declined to exercise jurisdiction; and (3) when significant connection jurisdiction is used in conjunction with continuing jurisdiction to allow a state that issued a custody order to modify it. . . .

Jeff Atkinson, *Modern Child Custody Practice* § 3-15 at 3-40 (2nd Ed 2001).

None of the circumstances apply in this case, and reliance on significant connection is misplaced. One of the purposes in enacting the UCCJEA was to avoid some of the jurisdictional conflicts, such as this, that arose under the UCCJA. The UCCJEA allows a court to assume jurisdiction in an initial child-custody determination based on significant connection only if the child has no home state. *In re: Jorgensen*, 627 N.W.2d 550 (Iowa 2001). Arkansas is the home state as conceded by DHS.

■ We also note that although the alleged significant connection is Florida's longstanding involvement with Stacy and Reuben Pruitt's children in Florida, dependency proceedings in Florida are not filed as to families, but rather as to individual children. Fla. Stat. Ann. § 39.501 (2001). This statute speaks of "proceedings seeking an adjudication that a child is dependent. . . ." The affidavit filed in the Florida court in support of the *ex parte* Order spoke to Cheyenne as an individual, not to her family. Florida Rule of Juvenile Procedure 8.650, pursuant to which the affidavit was submitted, speaks of "grounds to take a child into custody." There is no support in the Florida statutes for the argument that there is a case on a family that somehow would encompass Cheyenne upon her birth into the family. Thus, we reject the argument that there was an ongoing case in the State of Florida with respect to the Pruitt family that would somehow include Cheyenne and provide jurisdiction in Florida on that basis.

DHS argues a second basis for jurisdiction in Florida that deprived the probate court of jurisdiction and that is because there was a simultaneous proceeding in Florida. More specifically, DHS

argues that under Ark. Code Ann. § 9-19-206 (Repl. 2001), Florida had jurisdiction because the May 15, 2001, *ex parte* "Order to Take-Into-Custody," issued based upon an affidavit that Cheyenne was at substantial risk of imminent abuse or neglect, was issued before the probate court took jurisdiction on May 16, 2001. Ark. Code Ann. § 9-19-206 (Repl. 2002), provides that a court of this state may not exercise jurisdiction, excepting temporary emergency jurisdiction under Ark. Code Ann. § 9-19-204, where at the time of the commencement of the proceeding in this state, a proceeding concerning the custody of the child has already been commenced in the court of another state having jurisdiction substantially in conformity with this chapter. The dissent states that unquestionably Florida had a child-custody proceeding commenced before it as contemplated under § 9-19-206(b) and 9-19-102(4); however, unquestionably Florida did not have jurisdiction in substantial conformity with the very provisions the dissent cites. As such, the proceedings in Florida wére a nullity and could not be considered by the probate court.

■ It is undisputed that Cheyenne was born in Arkansas and had never been in Florida as of May 15, when the Florida court purported to issue an *ex parte* order to take Cheyenne into custody. A "child" for purposes of the UCCJEA "means an individual who has not attained eighteen (18) years of age." Ark. Code Ann. § 9-19-102(2) (Repl. 2002). This means that the UCCJEA does not apply to unborn infants. *See In re Unborn Child of Starks*, 18 P.3d 342 (Okla. 2001). The fact that Cheyenne may have been conceived in Florida is therefore of no impact in the analysis of jurisdiction. Until taken to Tennessee by DHS, Cheyenne had only lived in Arkansas. Under the UCCJEA, jurisdiction is decided on whether the state making the custody determination is the home state. Arkansas is the home state. The probate court correctly determined that it and not Florida had jurisdiction. Florida did not have jurisdiction in substantial conformity with the UCCJEA. It had no jurisdiction over Cheyenne.

In this same vein, DHS argues that Florida had jurisdiction under Fla. Stat. Ch. 61.13(2)(a), which provides:

> The.court shall have jurisdiction to determine custody, notwithstanding that the child.is not physically present in this state at the

time any proceeding·under this chapter, if it appears to the court that the child was removed from this state for the primary purpose of removing the child from the jurisdiction of the court in an attempt to avoid a determination or modification of custody.

This statute presupposes jurisdiction that does not exist in this case. Cheyenne was never in Florida to be removed from that state. Even though the dissent argues Cheyenne was ordered returned to Florida, this simply is not possible given she had never been there.

▪ DHS argues yet further that the probate court should have declined jurisdiction pursuant to Ark. Code Ann. § 9-19-208 (Repl. 2002), which provides that jurisdiction should be declined where a person seeking to invoke the jurisdiction of a court of this state under the UCCJEA has engaged in unjustifiable conduct. DHS alleges that Stacy Pruitt and Cox entered into a conspiracy to deprive Florida of jurisdiction. However, even assuming a decision by a grandmother-to-be and her pregnant daughter-in-law, who was unencumbered by an injunction or otherwise from leaving a state to give birth in another, amounts to unjustifiable conduct, DHS provides nothing other than the allegation that even this occurred. DHS provides no authority as to what constitutes "unjustifiable conduct." Further, this issue was raised before the probate court. We give due regard to the superior position of the probate judge in making such determinations and do not reverse unless the decision was clearly erroneous. *Dillard, supra.* The decision was not clearly erroneous. In any event, because the parents and Cox agreed to jurisdiction, the probate court had to accept jurisdiction. Ark. Code Ann. § 9-19-208(a)(1). Jurisdiction was also proper because no other state had jurisdiction. Ark. Code Ann. § 9-19-208(3). It would have been error had the probate court declined jurisdiction. Whether one might argue that this encourages persons to flee one state's potential jurisdiction in a dependency-neglect proceedings when a state is anticipating filing as soon as the child is born simply begs the question before this court and ignores the law.

One of the purposes of the UCCJEA is to avoid relitigation of child-custody determinations in other states. A "child-custody determination means a judgment, decree, or other order of a

court providing for the legal custody, physical custody, or visitation with respect to a child." Ark. Code Ann. § 9-19-102(3); Fla. Stat. Ann. § 61-503(3)(2002). Before a child-custody determination may be made, notice and an opportunity to be heard must be provided to persons who would be notified under state law, and specifically includes parents and persons having physical custody or who are acting as a parent. Ark. Code Ann. § 9-19-205 (2002); Fla. Stat. Ann. § 61.518 (2002); Fla. Stat. Ann. § 61.131(2001). *See also*, 28 U.S.C. 1738A(e).

 The order at issue is not a "child-custody determination"that may be enforced pursuant to the UCCJEA. It is admitted to be a "Take-into-Custody" order. The order states that it was issued pursuant to a verified affidavit. The affidavit provided facts sufficient for the court to believe Cheyenne was at "risk of imminent harm." It is an *ex parte* order for the state to take custody and is not enforceable under the UCCJEA or otherwise in Arkansas. The required notice and opportunity to be heard were not provided in *ex parte* proceedings. Ark. Code Ann. § 9-19-205 (2002); Fla. Stat. Ann. § 61.518 (2002). That this is an intrastate order to "Take-Into-Custody" is also apparent because it is addressed to "All and singular the sheriffs of the state of Florida or other law enforcement agencies." The dissent surprisingly declares that due process in Florida is satisfied by an *ex parte* hearing and an order based on an affidavit.

### Full Faith and Credit

DHS additionally argues that the trial court erred when it failed to accord the Florida order full faith and credit. We disagree.

 We first note that the procedure followed in this case by DHS was apparently receipt of the Florida *ex parte* "Order to Take-Into-Custody" by DHS, followed by DHS "picking up" the child, holding the child for Florida, and then transporting the child to Memphis where DHS turned the child over to Florida authorities. DHS's Brief in Support to Response to Petition for Order to Show Cause and Citation of Contempt confirms this where we find the following:

DHS's procedure is to honor sister state's orders and sister state's reciprocate by honoring similar Arkansas orders. When DHS caseworkers receive an order from a sister state, they refer the order to a DHS attorney. Once the DHS attorney reviews the order and determines its validity, the attorney instructs the caseworker to honor the order.

This is inconsistent with the UCCJEA (Ark. Code Ann. §§ 9-19-101—9-19-401) and also inconsistent with Arkansas law more generally. Cheyenne was removed from her home by the state. A state may not remove a child from his home, absent exigent circumstances, without notice and a pre-removal hearing. *Morrell v. Mock*, 270 F.3d 1090 (7th Cir. 2001); *Hollingsworth v. Hill*, 110 F.3d 733 (10th Cir. 1997).

It is more than troubling that counsel at DHS would take it upon themselves to determine whether an order from a foreign jurisdiction should be afforded full faith and credit, and then execute the order. That requires judicial process. DHS is authorized to take custody of a child without a warrant or order pursuant to Ark. Code Ann. § 9-27-313(a)(1)(C) (Repl. 2002), where there are clear reasonable grounds to conclude that the juvenile is in immediate danger. Even then, a hearing must be provided within seventy-two hours. Ark. Code Ann. § 9-27-313. Danger to the child was not at issue in this case. Likewise, law enforcement may not act except on a court order absent exigent circumstances. Ark. Code Ann. § 9-19-316 (Repl. 2002). DHS has not argued that this child was in danger, and in fact, DHS supervisor Henry testified to the contrary, that the child was not in any danger, and that she appeared fine and well cared for. We also note that in its pleadings, DHS stated, "The Arkansas Department of Human Services is holding the child for the State of Florida and has no custodial relationship with the above mentioned child. Further, the Arkansas Department of Human Services has not filed a petition for custody of the child and does not intend to do so." If DHS did not take custody of Cheyenne when they took her from the Cox home, then one is left to wonder just on what basis and on what justification she was in DHS's possession.

■ DHS apparently attempts to rely upon full faith and credit as the reason they enforced the Florida order, inferring they

must act upon an order from a foreign state to take a child into custody just as they must act on an order from a court of this state. This is directly contrary to longstanding elementary law. "The full faith and credit clause does not automatically make one state's judgment an enforceable judgment in another state; instead, for the purpose of giving it effect, an action must be brought to make it a judgment in the second state." 47 AM. JUR. 2d *Judgments* §946 (1995).

▪ Before uniform acts to enforce foreign judgments were adopted, an action had to be brought on the foreign judgment. *See Rice v. Rice*, 213 Ark. 981, 214 S.W.2d 235 (1948). Further, the mere filing of an action to enforce a judgment did not give the foreign judgment force and effect. A judgment of another state could not be executed in this state until the foreign judgment was first reduced to a domestic judgment. *Tolley v. Wilson*, 212 Ark. 163, 205 S.W.2d 177 (1947). Thus, under general full-faith-and-credit analysis, the order was void on this basis as well when DHS attempted to execute it.

▪ Nor will resort to the uniform acts assist DHS in its argument. The Uniform Enforcement of Foreign Judgment Act is codified at Ark. Code Ann. §16-66-601—16-66-617 (Repl. 2002). Thereunder, the foreign order must be registered, and notice must be given. This was not done in this case. In any event, DHS correctly asserts that this case is controlled by the UCCJEA. DHS did not comply with the UCCJEA, which requires notice and an opportunity to be heard among other requirements, and on May 16, 2001, full faith and credit were not due.

▪ Subchapter 3 of the UCCJEA as codified in this state provides how an order of child-custody determination is enforced. We note that we have already determined that the Florida *ex parte* "Order to Take-Into-Custody" is not a child-custody determination under the UCCJEA; however, even if it were, DHS was not entitled to act on it because they had not complied with the UCCJEA. Enforcement of foreign child-custody determinations is not a self-help process. Under Ark. Code Ann. § 9-19-305, the

order is registered in the appropriate court in this state.[2] Ark. Code Ann. § 9-19-305(a). In *Stone v. Stone*, 636 N.W.2d 594 (Minn. Ct. App. 2001), a party was attempting to enforce a South Dakota child-custody determination order in Minnesota. The Minnesota Court of Appeals stated, "Custody matters must be registered under the UCCJEA and child support matters must be registered under the UIFSA." *Stone*, 636 N.W.2d at 598. The Minnesota Court of Appeals further stated, "Minnesota cannot take jurisdiction of custody issues when there is neither proper registration under the UCCJEA nor assertion of an existing custody dispute." *Id.* A foreign child-custody determination must be registered to begin the process to enforce it.

Then, pursuant to Ark. Code Ann. § 9-19-305(b)(2), notice is served on certain persons, including any parent or person acting as a parent or person who has physical custody or claims rights of legal custody. Ark. Code Ann. § 9-19-305(a)(3) and § 9-19-209 (Repl. 2002); 28 U.S.C. §1738A(e). "Both the Parental Kidnapping Prevention Act and the Uniform Child Custody Jurisdiction Act require that the contestants be given 'reasonable notice and an opportunity to be heard.'" Jeff Atkinson, *Modern Child Custody Practice* § 3-5 at 3-92 (2nd Ed. 2001). In a footnote, the UCCJEA is added. *See also,* 28 U.S.C. §1738A(e); UCCJA § 4, 9, and UCCJEA § 106. The notice must tell the person that an enforceable determination has been registered and that the validity of the determination may be challenged by requesting a hearing within twenty days. In the notice, they are also told that if they do not challenge the order, it will be enforced. Ark. Code Ann. § 9-19-305(d). At the hearing, the person challenging the order may show that the issuing court did not have jurisdiction, or that it has been stayed, vacated, or modified. Ark. Code Ann. § 9-19-305(d)(2-3). After either the hearing is held and the validity of the order is upheld, or where no challenge was made, the order will be enforced by the court. Ark. Code Ann. § 9-19-306) (Repl. 2002). The UCCJEA also provides for issuance of a warrant to take the child into custody, and provides that law enforcement

---

[2] Registration was put in issue by DHS below. DHS argued that the order from Florida was entitled to full faith and credit under the UCCJEA. Under the UCCJEA, it can not be given full faith and credit unless it has been registered.

may be involved. Ark. Code Ann. § 9-19-316 (Repl. 2002). There is no mention of DHS anywhere in the subchapter. As already discussed, there is but one instance where DHS may act as they did in this case and that is where a child is in immediate danger. This authority does not exist under the UCCJEA, but instead under Arkansas Code Annotated, Chapter 27, Juvenile Courts and Proceedings. Ark. Code Ann. § 9-27-313(a)(1)(C) (Repl. 2002). DHS does not assert they acted based upon any danger to Cheyenne.

The UCCJEA streamlines enforcement of foreign child-custody determinations in that they will be enforced in another state if, upon notice, the affected persons do not challenge the jurisdiction of the rendering court or, where they do, but the court in the enforcing state determines jurisdiction was proper. The UCCJEA does not dispense with proceedings to enforce the order in the state where it is to be enforced.

It is not up to DHS to decide what orders it will follow and what orders it will ignore. Further, it is up to Florida to register and enforce the order. They might well appropriately seek DHS's help, but the process must be followed or we have chaos and acts not subject to the required supervision of the courts, as in this case.

There are additional problems with the Florida *ex parte* order in this case. The *ex parte* order to take into custody addresses "Florida and Other Law Enforcement Agencies." The agency that took Cheyenne was the Arkansas Department of Human Services. It is unclear that this *ex parte* order was directed at anyone other than law enforcement in Florida. Too, DHS is not a law enforcement agency. It was not obligated or empowered by the order to seize Cheyenne even if it had been a valid, enforceable order. There was neither provision under the Florida *ex parte* order nor under the laws of this state for the action taken by DHS. Cheyenne was a child under the jurisdiction of this state and entitled to the protection of the courts of this state.

DHS's conduct in this case is deeply disturbing. DHS asserts they were confused because they had two conflicting orders, one telling them to turn the child over to Florida, and one

telling them to return the child to Joyce Cox. DHS asserts they acted on the first-in-time order. The simple fact is DHS was faced with one valid order to follow, that of the Probate Court of Greene County. Full faith and credit is not a complex or obscure legal principle. It requires the involvement of the courts of this state in enforcement of foreign judgments. DHS is utterly without authority to execute an order from a foreign jurisdiction on its own. DHS is not empowered to take custody of children except pursuant to the limited circumstances set out in the statutes, which requires immediate judicial review, or pursuant to an order of a court of this state.

Affirmed.

GLAZE and IMBER, JJ., dissent.

TOM GLAZE, Justice, dissenting. This case clashes with the purposes of both the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), Ark. Code Ann. §§ 9-19-101 to -317 (Repl. 2002), and the Parental Kidnapping Protection Act (PKPA), 28 U.S.C. § 1738A, and represents a classic example of how a state should *not* interpret and apply those Acts. Those Acts were enacted to encourage cooperation between sister states in custody matters. Arkansas's courts in this case have failed miserably to comply with the intent and letter of the UCCJEA and the PKPA.

The facts leading to this appeal are largely undisputed, and a fair summary of the facts will reflect how Arkansas courts have declined to extend any cooperation with Florida. That state clearly had the paramount interests in resolving this custody matter involving a ten-day-old child named Cheyenne Pruitt Cox, whose only contact with Arkansas is that she was born in Arkansas and was only ten days old when her paternal grandmother, Joyce Cox, filed an action in an Arkansas probate court seeking guardianship of Cheyenne. This case is all about the Pruitt family which lives in Florida; to understand this case, I first introduce the reader to the members of that family and the family's relevant history.

Stacy and Ruben Pruitt have been and remain Florida residents and domiciliaries. In 1999, the Florida Department of

Children and Family Services investigated complaints regarding Stacy and Ruben and their children, and this investigation resulted in initiating dependent-neglect proceedings against the Pruitts. These proceedings culminated in Florida's DCFS's petition to terminate the Pruitts' parental rights with respect to their other children. In that Florida proceeding, the Pruitts lost custody of their other children for failure to protect them, failure to complete required case plans, for using drugs, and for the abandonment of their children. Ruben's mother, Joyce Cox, lived in Florida during this period and was given custody of the children for three months; however, she called Florida's DCFS and asked DCFS to take them back because the children were rowdy.

Cox then moved to Arkansas in March of 2001, and has lived in Paragould since April 2001. In late April 2001, Stacy and Ruben "showed up" at Cox's home. Stacy was in a late-pregnancy stage, and she went to a doctor who advised her not to travel back to Florida because she might go into labor and have the baby. The Pruitts remained in Arkansas until after Cheyenne's birth on May 5, 2001. Stacy and Ruben left Arkansas to return to Florida on May 12, 2001, but they left the baby with Joyce Cox until further notice of what was going to happen to the Pruitts' other children in the Florida proceeding. Stacy placed the name "Cox" on the baby's birth certificate so the child's full name was shown as "Cheyenne Ione Pruitt Cox." Cox and Stacy had talked about giving the child the name "Cox," but Cox only learned of this after Cheyenne's birth on May 5, 2001.

As the reader may clearly surmise from the above, the only contact Stacy, Ruben, and Cox had with Arkansas during this period of controversy is Cox's move to Arkansas in March or April of 2001, and the Pruitts' brief few weeks' stay in April and May, during which Stacy gave birth to Cheyenne.

On May 15, 2001, the circuit judge in the Florida proceeding issued an order for Cheyenne to be taken into custody. In his order, the Florida judge stated Cheyenne was possibly in Paragould with Joyce Cox, Stacy's mother-in-law. On May 15, 2001, the Arkansas Department of Human Services (DHS), acted on that Florida court order by going to the Cox home and taking

physical custody of Cheyenne. However, on May 16, 2001, Joyce Cox promptly petitioned the Probate Court of Greene County, Arkansas for guardianship of Cheyenne, and, on the same day, filed Stacy's and Ruben's consents, whereby they agreed that Cox should be appointed guardian. On the same date, the Greene County Probate Court entered an *ex parte* temporary order awarding Cox guardianship of Cheyenne, and setting another hearing on May 18, 2001. No record was made of the *ex parte* hearing.[1]

On May 17, 2001, the Arkansas DHS moved to dismiss the Arkansas guardianship proceeding, submitting that the Florida court had jurisdiction of this matter and, under § 9-19-313 of the UCCJEA and U.S. Const. art 4, § 1, the State of Arkansas was required to give full faith and credit to its sister state, Florida's, May 15, 2001, order giving that state custody and jurisdiction over Cheyenne. Cox responded, arguing the Florida DCFS and Arkansas DHS had failed to show facts sufficient to establish a jurisdictional claim involving Cheyenne. Cox further contended that, under the UCCJEA, the Arkansas probate court had initial child-custody jurisdiction over Cheyenne because she had lived only in Arkansas, making it her home state.

At a hearing commencing on May 18, which was continued to and ended on May 21, 2001, the probate court considered testimony and arguments of counsel. DHS argued the Arkansas action should be dismissed because Florida had continuing jurisdiction under the PKPA, or, alternatively, under the UCCJEA, § 9-19-207, because Florida was the more appropriate forum. The court denied DHS's motion to dismiss the guardianship proceeding, holding the Florida court's May 15, 2001, order was not entitled to full faith and credit. The court further ordered DHS to take such action necessary to return Cheyenne to Arkansas and place her in the temporary care of Cox. On May 18, 2001, DHS had already turned Cheyenne over to the Florida DCFS as directed by the Florida court's May 15, 2001, order. The Arkansas judge set a

---

[1] Administrative Order Number 4 – Verbatim Trial Record. Unless waived on the record by the parties, it shall be the duty of any circuit, chancery, or probate court to require that a verbatim record be made of all proceedings pertaining to any contested matter before it.

final hearing on the guardianship issue to be held on July 30, 2001. This May 21, 2001, order denying DHS's motion to dismiss was entered on June 21, 2001.

At the July 30, 2001, hearing, counsel for Cox, Arkansas's DHS, and Florida's DCFS appeared, and further testimony and arguments were offered. At this hearing, Cox's attorney complained that the Arkansas DHS and the Florida DCFS counsel argued jurisdiction issues regarding the UCCJEA and the PKPA, but pointed out that the probate court had denied giving the Florida *ex parte* order recognition because the order was not final. In its order filed on September 19, 2001, the Arkansas probate court again agreed with Cox and appointed her to serve as Cheyenne's guardian. As provided and directed under § 9-19-206 of the UCCJEA, when simultaneous proceedings exist, the court's order related that the probate court made an unsuccessful attempt to discuss the issue of jurisdiction with the Florida court. After such effort, the court concluded the Florida court's May 15, 2001, order was not final and appealable and, therefore, not entitled to full faith and credit. The probate judge further found that the Arkansas DHS had willfully violated its order by refusing to return Cheyenne to Cox and by delivering Cheyenne to Florida representatives on May 18 for transport to Florida. The probate court further ordered Arkansas DHS to reimburse Cox all reasonable expenses incurred in the return of Cheyenne, and found that DHS could purge itself of contempt by returning Cheyenne to Cox. It also held that any defect in service and notice raised by DHS was waived by it because DHS never objected, its employees and agents admitted having knowledge of the Arkansas court's order of May 16, 2001, and they had actively participated in the case since its filing.

DHS brings its appeal from the probate court orders of May 16, May 21, June 21, and September 19, 2001. DHS contends the probate court erred (1) in refusing to give full faith and credit to the Florida court's May 15 order directing Cheyenne be picked up and returned to Florida, and (2) in ruling that Arkansas, not Florida, had jurisdiction of this matter under the UCCJEA and the PKPA.

DHS first argues that the Arkansas court erred by refusing to recognize the Florida court order based on the fact that the order was an interlocutory order rather than a final one. The probate court was in error by ruling it could only consider orders or judgments that concluded a custody proceeding. Cox attempts to support the Arkansas court's ruling by citing the case of *Gladfelter v. Gladfelter*, 205 Ark. 1019, 172 S.W.2d 246 (1943), for the stated proposition that, in order for a judgment or decree of one state to be recognized and enforced in a sister state, it is necessary that the judgment shall be final, and not interlocutory.

*Gladfelter* was decided long before the enactment of the PKPA in 1980 and the passage of Arkansas's UCCJEA in 1999.[2] Both of these laws contemplate the enforcement of custody determinations that need not always finalize a child-custody proceeding. An analysis of the UCCJEA clearly reflects why an interlocutory order requires recognition by sister states. For example, § 9-19-313 of the UCCJEA reads as follows:

> A court of this state shall accord full faith and credit to an order issued by another state and consistent with this chapter which enforces a child-custody determination by a court of another state unless the order has been vacated, stayed, or modi-fied by a court having jurisdiction to do so under subchapter 2 of this chapter.

In making its argument, DHS relies on § 9-19-206(a) and (b) of the UCCJEA, which control when simultaneous proceedings in different states are underway. Those subsections read, in pertinent part, as follows:

> (a) Except as otherwise provided in § 9-19-204,[3] *a court of this state may not exercise its jurisdiction under this subchapter if, at the time of the commencement of the proceeding, a proceeding concerning the custody of the child has been commenced in a court of another state having*

---

[2] Arkansas originally adopted the Uniform Child Custody Jurisdiction Act, the UCCJA, Ark. Code Ann. § 9-13-201, *et seq.*, in 1979; the UCCJA in Arkansas was repealed when the General Assembly enacted the UCCJEA. *See* Act 668 of 1999, § 405.

[3] Section 9-19-204 gives a state temporary emergency jurisdiction. In my view, the Arkansas DHS could have easily requested relief under this statute since the Pruitts were found to be unfit parents and Cox had conceded an inability to care for the Pruitt children.

*jurisdiction substantially in conformity with this chapter, unless the proceeding has been terminated or is stayed by the court of the other state because a court of this state is a more convenient forum under § 9-19-207.*

(b) Except as otherwise provided in § 9-19-204, a court of this state, before hearing a child-custody proceeding, shall examine the court documents and other information supplied by the parties pursuant to § 9-19-209. *If the court determines that a child-custody proceeding has been commenced in a court in another state having jurisdiction substantially in accordance with this chapter, the court of this state shall stay its proceeding and communicate with the court of the other state. If the court of the state having jurisdiction substantially in accordance with this chapter does not determine that the court of this state is a more appropriate forum, the court of this state shall dismiss the proceeding.*[4] (Emphasis added.)

In reviewing and applying the above provisions to the situation now before this court, it is clear that, on May 15, 2001, the Florida court had issued an order for the Florida DCFS to take custody of Cheyenne in an ongoing dependent-neglect action commenced in 1999, involving Stacy and Ruben Pruitt and their other children.[5] Because the Pruitts and their other children were parties to the ongoing Florida court proceeding, that court exercised its jurisdiction and authority to order Florida's DCFS to locate and take custody of Cheyenne. Unquestionably, the Florida court had a child-custody proceeding commenced before it, as contemplated under §§ 9-19-206(b) and 9-19-102(4) when that court issued its May 15 order. Section 9-19-102(4), in relevant part, provides that "child-custody proceeding" means a proceeding in which legal custody, *physical custody*, or visitation with respect to a child is an issue. The majority relates that the Florida court's order seeking physical custody of Cheyenne was not a "child custody determination" that may be enforced under the UCCJEA, but this statute states otherwise. Indeed, because the

---

[4] No one questions whether Florida has a law that establishes jurisdiction substantially in accordance with Arkansas's law, likely because Florida has also adopted the UCCJA. *See* Fla. Stat. Ann. § 61.1302, *et seq.*

[5] There is some dispute as to whether Ruben Pruitt is the father of one of the five children, but that issue is of no importance to the issues raised in this appeal. It is clear that Cheyenne is a sister to all five siblings.

Florida court had continuing jurisdiction over the Pruitts and their children, and because Florida DCFS had custody and jurisdiction over the Pruitts' children, I would maintain that the Pruitts themselves did not have the authority to consent to Cox's petition for guardianship.

Upon learning of the Florida court's order, the Arkansas probate court was required under § 9-19-206(b) to stay its proceeding and communicate with the Florida court. The record reflects that, when the probate court issued its *ex parte* order on May 16, Cox's counsel had informed the court of the Florida court's order. In fact, on May 17, DHS filed a motion to dismiss because the Arkansas court should give full faith and credit to the Florida court's order, and apprised the probate court that the Florida DCFS had an open case on the Pruitt family. Moreover, when the probate court reconvened on May 18 to consider DHS's motion to dismiss Cox's guardianship petition, DHS again informed the probate court of the ongoing Florida proceeding and advised the court that DHS had delivered Cheyenne to Florida's authorities pursuant to that state's court order. The probate court continued its proceeding to May 21, when the probate court resumed its hearing and testimony was offered. At this hearing, DHS presented its position that it was placed in the dilemma of having a May 15 Florida court order to take physical custody of Cheyenne and an Arkansas probate court order of May 16 directing temporary guardianship be placed with Cox. After the Florida authorities made arrangements to pick up Cheyenne at 7:30 a.m. on May 18, DHS, in accordance with those arrangements, turned over custody of Cheyenne to Florida authorities. Also, at the May 21 hearing, DHS gave the Arkansas court the name of the Florida judge who had issued the Florida order, so that the Arkansas court could communicate with that judge.

Cox, on the other hand, testified that she had, could, and would care for Cheyenne. Of course, Cox was familiar with the court proceedings in Florida, since for a short period, Cox had had custody of Stacy's other children, although she returned them as already mentioned above.

The Arkansas court held another hearing on July 20, 2001, on Cox's request for a final guardianship order, and in addition to DHS and Cox's counsel, Florida's DCFS attorney, Daniel Lake, appeared and participated in the proceeding. Much of what occurred at this hearing was repetitive of the testimony and arguments presented at the earlier hearings. Cox and her husband made it clear that they had provided a place for Cheyenne to stay in their home, and had obtained insurance and other benefits that would be to the infant's best future interests. Cox also denied that it was hers or the Pruitts' intent to hide Cheyenne by giving Cheyenne the last name of Cox. Florida DCFS counsel, Mr. Lake, informed the Arkansas judge that the Florida judge had tried to contact the Arkansas judge, but had been unsuccessful, and the probate judge said that he likewise had been unsuccessful in communicating with the Florida court. From the record, it is impossible to discern if the Arkansas judge made more than one attempt to contact the Florida judge. However, the record is clear that, when the Florida judge did not reach the Arkansas judge, the Florida judge instructed the Florida DHS counsel to appear at the Arkansas proceeding to be sure the Arkansas court was aware that Florida claimed a continuing interest and jurisdiction over the Pruitt family. Through cross-examination of Cox and her husband and by argument by Mr. Lake to the probate court, Lake charged that the Pruitts and Cox had made a concerted attempt to evade the Florida court and DCFS representatives, so those authorities could not take custody of Cheyenne after her birth.

In summary, my review of the record shows that when the Arkansas probate court assumed jurisdiction of Cox's guardianship action, Florida had already entered its order for authorities to return Cheyenne to Florida. Under § 9-19-206(b), the probate court was mandated to stay its proceeding and communicate with the Florida court. The Arkansas court here did neither. The record reflects that DHS gave the Florida judge's name to the probate judge at the end of the May 21 hearing, but it was only at the July 20 hearing when the Arkansas judge indicated that he had tried to contact the Florida court. Nonetheless, § 9-19-206(b) further dictates that if the Florida court does not determine that

the Arkansas court is a more appropriate forum, the Arkansas court *shall* dismiss its proceeding.

It is obvious that the Arkansas court did not comply with § 9-19-206, and while the Florida court did not make earlier contact with the Arkansas judge, that court, by directing Florida's DCFS to appear at the Arkansas proceeding held on July 20, 2001, communicated its belief that Florida was the appropriate forum to consider Cheyenne's best interests. As discussed above, both of Cheyenne's parents live in Florida, Cheyenne's siblings are there, and a three-year investigation of the Pruitts and their treatment of their children is ongoing in Florida. As alluded to earlier, Cox had lived in Florida and had custody of Stacy's children until Cox decided to move to Paragould in March or April of 2001. It is abundantly clear that Cheyenne's parents and her grandmother Cox have had closer connections with the Florida court when the Florida and Arkansas courts' respective May 15 and 16 orders were entered. This Florida history and connections will also play a significant part in that state's parental termination proceeding which will undoubtedly affect Cheyenne.

Some of the general purposes of the UCCJEA are to (1) avoid jurisdictional competition and conflict with courts of other states in child custody matters; (2) *promote cooperation with the courts of other states to the end that a custody decree is rendered in the state that can best decide the case in the best interest of the child*; (3) *assure that litigation concerning the custody of a child take place ordinarily in the state in which the child and his family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships are most readily available, and that courts of this state decline the exercise of jurisdiction when the child and his family have a closer connection with another state*; (4) discourage continuing controversies over child custody in the interest of greater stability for the child; (5) facilitate the enforcement of custody decrees of other states; and (6) *promote and expand the exchange of information and other forms of mutual assistance between the courts of this state and those of other states concerned with the same child. Elam v. Elam*, 39 Ark. App. 1, 832 S.W.2d 508 (1992) (emphasis added); *see also Perez v. Tanner*, 332 Ark. 356, 965 S.W.2d 90 (1998). Because the Florida court is obviously more closely associated with this case than the Arkansas

court, the purposes of the UCCJEA would be better served by returning this matter to the Florida court.

As a final matter, I consider whether the foregoing analysis· and terms of the UCCJEA conflict with the PKPA because, if it does, the federal act controls. In this respect, Cox raises an alternative argument in her brief, asserting that the Arkansas court's exercise of jurisdiction was proper under the PKPA. She asserts that the Florida court's order was not consistent with § 1738A(c) of the PKPA, which provides, in pertinent part, as follows:

> (c) A child custody or visitation determination made by a court of a State is consistent with the provisions of this section only if —
>
> (1) *such court has jurisdiction under the law of such State; and*
> (2) *one of the following conditions is met:*
>
> (A) *such State (i) is the home state of the child on the date of the commencement of the proceeding,* or (ii) had been the child's home state within six months before the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, *and a contestant continues to live in such State;*
>
> (B)(i) *it appears that no other State would have jurisdiction under subparagraph (A),* and (ii) it is the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than the mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships[.] (Emphasis added.)

28 U.S.C. § 1738A(c).

Cox argues that, under § 1738A above, Arkansas has jurisdiction of Cheyenne's proceeding because Arkansas is her home state since she was born in Arkansas and had never left the state prior to the entry of the Florida May 15, 2001, order. In addition, Cox further submits that Florida cannot gain jurisdiction under § 1738A(c)(2)(B)(i) and (ii) because the first prong in (i) requires the state desiring to exercise jurisdiction of a custody matter to first make a determination that no state would have jurisdiction

under (A). In other words, because Arkansas is Cheyenne's home state, Florida fails to meet the requirement in (B)(i) and (ii) and, therefore, the significant-connection requirement (B)(ii) does not come into play.

As Cox points out, home state is a governing factor when considering whether the PKPA should be applied, but it is not the sole consideration. In fact, our court has stated the PKPA hierarchy of jurisdiction preferences are: (1) continuing jurisdiction; (2) home-state jurisdiction; (3) significant connection; and (4) jurisdiction when no other jurisdictional basis is available. *Murphy v. Danforth*, 323 Ark. 482, 915 S.W.2d 697 (1996); *Moore v. Richardson*, 332 Ark. 255, 964 S.W.2d 377 (1998). The *Murphy* court held that the PKPA prohibits a court from exercising jurisdiction inconsistent with the provisions of the Act. The court cited § 1738(a)(g) as a provision meant to avoid the "havoc wreaked by simultaneous and competitive jurisdictions." *Id.* at 490. The PKPA, § 1738A(g), reads as follows:

> A court of a State shall not exercise jurisdiction in any proceeding for a custody or visitation determination commenced during the pendency of a proceeding in a court of another State where such a court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody or visitation determination.

It is worth repeating that Florida had an ongoing proceeding where that state ended the Pruitts' custody of their other children. Before the proceedings to terminate the Pruitts' parental rights were concluded, Stacy came to Arkansas, gave birth to Cheyenne, left the baby with Cox, and returned to Florida. When Cheyenne was only ten days old, the Florida court issued its May 15 order to locate, pickup, and return Cheyenne to Florida because of that court's express concern that the child may be at substantial risk of imminent harm. As previously stated, it was only a day later, May 16, that the Arkansas court entered its order granting Cox's request to be appointed Cheyenne's guardian.

Undoubtedly, the Arkansas court was quite assured that Cheyenne was safe and not in imminent danger when the court appointed Cox as guardian. Even so, when the Florida court

issued its May 15 order, based on the ongoing investigation of the Pruitts and their treatment of Cheyenne's siblings, it prudently entered an order seeking Cheyenne's return to its forum. Moreover, even though the Arkansas court did not find Cheyenne in any danger, the Florida court continued its jurisdiction over the Pruitts, who remained in Florida, and over any termination of parental rights the State of Florida may ultimately seek involving any or all of the Pruitts' children. It should be noted that in both Florida and Arkansas, one of the grounds for terminating parental rights is when such rights to a sibling or siblings have been terminated involuntarily. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(4)* (Repl. 2002); Fla. Stat. Ann. § 39.801, *et seq.* *See also Paslay v. Ark. Dep't of Human Servs.*, 75 Ark. App. 19, 53 S.W.3d 67 (2001); *S. D. v. Dept. of Children & Family Servs.*, 805 So. 2d 10 (Fla. Dist. Ct. App. 2001). Clearly, if Florida terminates the Pruitts' parental rights to Cheyenne's five siblings, such action will heavily affect Cheyenne's future. This factor alone presents a connection with Florida that dictates that Cheyenne's interests should be protected in that termination proceeding.

I am mindful of Cox's contention that Florida exercised no continuing jurisdiction regarding Cheyenne because no order or decree was pending involving custody of the child. Cox states, and the majority agrees, that the only order issued by the State of Florida was an order directing Cheyenne to be taken into the custody of the Florida DCFS at a time when Cheyenne had never been in Florida.

The question of Florida's "continuing jurisdiction" under the PKPA and that state's ongoing proceedings with respect to the Pruitt family form the crux of my disagreement with the majority. Section 9-19-102(4) of the UCCJEA defines a "child-custody proceeding, broadly, to mean a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue, and that *the term includes* a proceeding for divorce, guardianship, paternity, *termination of parental rights*, and protection from domestic violence." (Emphasis added.) Here, the Florida court had jurisdiction of the Pruitts in a dependent-neglect and abuse case which also included a termination of the Pruitts' parental rights; this Florida proceeding necessarily involved Cheyenne because her

parents also lived in Florida and continued to be parties in the Florida court proceedings. Florida's action is consistent with the purposes of the UCCJEA and the PKPA.

Before concluding, it is necessary to address a series of points made in the majority opinion. While those points appear clearly misdirected from the fundamental purposes of the UCCJEA and PKPA, I feel obliged to briefly discuss them.

First, the opinion suggests that Florida had no jurisdiction over Cheyenne because she was born in Arkansas, never lived in Florida, and Arkansas is Cheyenne's home state. The opinion ignores the fact that Cheyenne's mother and father are domiciliaries of Florida who, since 1999, have been involved in a custody and termination-of-parental-rights proceeding in that State. Obviously, that Florida proceeding involves Cheyenne because, even under Arkansas's long-settled law, Cheyenne is a domicile of Florida.[6] *See Minetree v. Minetree*, 181 Ark. 111, 26 S.W.2d 101 (1930) (court recognized the general rule that an infant cannot of his own volition acquire a domicile; it is also a well-established rule that the domicile of every person at his birth is the domicile of the person on whom he is legally dependent, whether it is at the place of birth or elsewhere; and so the domicile of the father is in legal contemplation the domicile of his minor children); *see also* Luther L. McDougal, III, *et al.*, *American Confllicts Law*, § 12, at 27 (5th ed. 2001) (when a legitimate child is born of a living father, its domicile is that of his father); *Restatement (Second) of Conflicts of Law* § 14 (1969) (the domicile of a legitimate child at birth is the domicile of its father at the time; on occasion, a child's domicile of origin will be in a place where the child has never been); 25 Am. Jur. 2d *Domicile* § 11 (1996).[7]

---

[6] The majority makes reference to the fact that Cheyenne was conceived in Florida, and asserts that this "is of no impact" in the analysis of the situation. However, this analysis of domicile does not depend on the location of the infant's conception, and it is thus not clear why the majority highlights this issue.

[7] The majority opinion glosses over this longstanding law by saying the Arkansas case was rendered prior to the UCCJEA and PKPA. These Acts in no way supplant the rules of law dealing with fixing an infant's domicile, and clearly can be harmonized with the UCCJEA's simultaneous proceedings provisions when sister states are asserting jurisdiction in a custody case.

Here, the record clearly reflects that both of Cheyenne's parents live in Kissimmee, Florida, and because Cheyenne is an infant too young to establish her own domicile, Florida is her domicile. Given this legal contact with Florida, Florida undoubtedly has sufficient contacts and jurisdiction to decide Cheyenne's fate and relationship with her parents. Although Arkansas's DHS does not dispute Arkansas as being Cheyenne's home state as defined under § 9-19-102(7) of the UCCJEA, Florida still has jurisdiction to determine the Pruitts' parental and custody rights over Cheyenne. It is this type of conflicting situation that lends itself for resolution under a simultaneous proceeding analysis provided in § 9-19-206(a) and (b) of the UCCJEA, as discussed earlier in this opinion. Once again, while the majority opinion disavows *forum non coveniens* as a viable issue in this case because of its contention that the ongoing Florida proceeding has nothing to do with Cheyenne (but only involves the Pruitts' other children), such disavowment is not supported by law or facts since the Florida court has jurisdiction over the entire Pruitt family, including Cheyenne.

The majority opinion takes issue with the Florida May 15, 2001, order and submits that order is not entitled to full faith and credit because that order was never registered in Arkansas under Ark. Code. Ann. § 9-19-305(a) (Repl. 2002).[8] This statute was not raised or argued below, likely because that statute provides only that such a child-custody determination of another state *may* be registered in this state. In the instant case, the Arkansas probate court and Cox were well aware of the states' respective orders issued by the Florida and Arkansas courts. Those orders were before the Arkansas probate court, which conducted hearings on those orders. In short, all parties fully availed themselves of due process by virtue of hearings on all issues. As has already been

---

[8] Section 9-19-305(a), in relevant part, provides that a child-custody determination issued by a court of another state *may* be registered in this state, with or without a simultaneous request for enforcement. The majority's reliance on *Stone v. Stone*, 636 N.W.2d 594 (Minn. Ct. App. 2001), to support its argument about the registration of judgments is misplaced because, in that case, the question was simply a procedural matter of whether or not the mother had properly registered a foreign custody order in her new home state, and there was no question of an existing ongoing custody proceeding in a sister state, such as we have here.

pointed out, both Cox and DHS were before the Arkansas probate court on May 17, 2001, and the parties' conflicting orders were placed in issue and fully tried later. Again, both the Arkansas and Florida courts and parties were on notice that simultaneous proceedings were ongoing and should have been decided in accordance with UCCJEA provision § 9-19-206. It would be senseless and a waste of time for DHS to register the Florida court order in a separate proceeding when DHS filed the Florida court order with the Arkansas court on May 16 and 17, asking that court to give full faith and credit to the sister state's order.

I also note that the majority, in several places, refers to the Florida court's order as being "void." This is not the case, however. In the Florida proceeding, the Pruitts and DCFS were parties in that proceeding that placed the Pruitts' children in state custody, and the Pruitts failed to appeal from those determinations. They are thus bound by the Florida court's orders. *See* Robert A. Leflar, American Conflicts Law, § 79 (9th ed. 1986). Cox, as a grandparent, has no greater right to challenge these orders than do the Pruitts. *See Suster v. Arkansas Dept. of Human Servs*, 314 Ark. 92, 858 S.W.2d 122 (1993). The Florida court order here clearly is entitled to full faith and credit.

The majority opinion also discusses its concern, under the circumstances of this case, that the Arkansas DHS may now decide what orders DHS will follow and what orders it will ignore. While the majority makes much of the Arkansas probate court's finding that DHS had violated its May 16, 2001, order, neither DHS nor Cox relies on that finding in this appeal. The contempt issue is a collateral matter that simply is not a part of this appeal. Suffice it to say, DHS acts at its own peril if it willfully violates a court order, even one that may be voidable. This court has made it very clear that the fact that a decree or order is erroneous does not excuse disobedience on the part of those bound by its terms until the order is reversed. *See Pike v. State*, 344 Ark. 478, 40 S.W.3d 795 (2001); *Etoch v. State*, 332 Ark. 83, 964 S.W.2d 798 (1998). However, whether DHS has acted in contempt should in no way affect the Florida court's jurisdiction and authority to seek the recognition to which that court's order is entitled under the UCCJEA or PKPA. Unfortunately, I believe DHS's apparent

decision to act contrary to the Arkansas court's May 16 order has played an integral part in deciding Arkansas should retain jurisdiction over Cheyenne, and while I might agree that DHS acted improperly in those circumstances, this state should not retain jurisdiction because of those actions.

In sum, none of Cox's points has merit, and I suggest that, by adopting Cox's theories, this court is acting contrary to the purposes of the UCCJEA and PKPA. As for Mrs. Cox, she was a Florida domicile when the 1999 Florida proceeding commenced and only became an Arkansas resident immediately before the Arkansas proceeding was filed. If Cox had a strong will to serve as a custodial caretaker of any of the Pruitts' children, she could, as she has done in the past, make that claim in the Florida court.

For the reasons stated above, I would reverse and remand.

IMBER, J., joins this dissent.