Lovell JOHNSON, II *v.* ARKANSAS DEPARTMENT OF HUMAN SERVICES, *et al.*

CA 01-1093 82 S.W.3d 183

Court of Appeals of Arkansas
Divisions I and IV
Opinion delivered June 26, 2002

114

*Charles R. Hoskyn*, for appellant.

*Dana McClain*, for appellee.

JOHN B. ROBBINS, Judge. Appellant Lovell Johnson II appeals the termination of his parental rights as to three young boys, Marquis, Lovell III, and Ladarius, as entered by the Pulaski County Circuit Court on June 29, 2001. The boys were approximately one year apart in age and under school-age when parental rights were terminated. The mother does not appeal. As appellant's sole point for reversal, he argues that the chancellor was clearly erroneous in finding that the Department of Human Services ("DHS") made a meaningful effort to rehabilitate the home and correct the conditions that caused removal of the children. More specifically, appellant asserts that DHS did not provide sufficient services to him such that the statutory grounds to support termination found in Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) are not met. We disagree and affirm.

The three children involved in this case were born on April 2, 1996 (Marquis), June 5, 1997 (Lovell III), and August 12, 1998 (Ladarius). The current appeal stems from the second case file opened on the family. The first case file was opened on December 29, 1997, after Lovell III was referred by a doctor, who was treating the mother, to Arkansas Children's Hospital. Lovell III was suffering from extreme malnourishment, unnoticed by the parents. Lovell III was diagnosed with failure to thrive, caused by

the parents feeding the infant watered-down formula. The family was given services, including psychological examinations and therapy, in-home parenting classes, transportation, and supervised visitation. Appellant was ordered to complete paternity testing because he claimed the children as his own but had not been adjudicated to be their father. Appellant did not establish paternity. The first case was closed from the court's perspective some time in 1998.

The second case file was opened on November 4, 1999, after appellant dropped the mother and the three boys, ages three, two, and one at the time, at a Salvation Army Shelter in Little Rock, Arkansas, without informing the mother of his whereabouts. The mother called DHS, and a case worker initiated another case file on the family. DHS took emergency custody of the children on November 9, 1999. A hearing was conducted on November 16, 1999, at which probable cause was found to continue the children in the custody of DHS because, despite services rendered, the family had no means to support the children. The children were placed together in a foster home, where they remained throughout the case.[1]

An adjudication hearing was set for January 4, 2000, and commenced on that date. The children were found to be dependent-neglected, but not due to poverty per se. Both parents appeared, and it was demonstrated that they lived together at the Heritage House Inn, a motel; that they had a prior DHS case on Lovell III; that appellant had been directed to establish his paternity in the earlier case by an order on January 29, 1998, but had not done so; that appellant was working but the mother was not; and that they somehow could not manage the income earned by appellant. Appellant testified that he did not want to be tested for paternity because he wanted to avoid a child support obligation, and the trial judge informed appellant that reunification services were not going to be offered to him unless and until he proved

---

[1] There was one exception when the eldest child was removed from the foster home for a brief time due to abuse inflicted by another foster child, but the boys were reunited in the same foster home.

paternity other than by his verbal claim. The case was continued to May 23, 2000, for purposes of permanency planning.

At the permanency planning hearing, the testimony established that the mother and appellant were living in the Cimmaron Motel, and the mother was pregnant again. Appellant told the judge that he was "gonna handle" the paternity testing but just could not get it done up to that point due to his work schedule. Services, including parenting classes, therapy, transportation, and visitations were provided to the mother, and the children received services in foster care. Due to the obvious cash-flow problem, the trial judge ordered random drug testing of the parents.[2] A termination hearing was set for November 14, 2000, unless circumstances changed.

On November 14, 2000, the termination hearing was held. Both parents were represented by counsel at this point. Appellant appeared but the mother did not. She had fled to Texas to give birth. Although her rights were terminated, that is not the subject of this appeal. Evidence presented at the termination hearing relevant to appellant demonstrated that appellant tested positive for cocaine on June 28, 2000, and that he was arrested on charges of aggravated robbery and theft of property on July 18, 2000, with regard to a gas station in southwest Little Rock. Appellant's counsel argued that sufficient services were not rendered to appellant such that his rights should not be terminated. The judge held termination in abeyance with regard to appellant, who was currently jailed, so that he could receive some services as best as they could be administered. Services to be rendered included parenting classes, a housing referral, a therapy referral, a drug and alcohol

---

[2] The trial court expressed concern as to where appellant's income was going. While the dissenting opinion characterizes the cause of the children's removal as resulting from poverty, the record reflects that appellant did not have an unreasonably low income. There was evidence at the adjudication hearing held on January 4, 2000, that appellant worked for a chemical-spill recovery business and he testified that his last bi-weekly paycheck was for a net of $700. At the permanency planning hearing held May 23, 2000, appellant testified that he continued to be employed by this employer and that he had worked 71 ½ hours, which included significant overtime, within the week just preceding the hearing.

assessment and screening, and a second psychological evaluation.[3] Appellant was ordered, again, to prove his paternity. A permanency planning hearing was set for March 6, 2001.

At the March hearing, it was learned that appellant was convicted of his charges and was sentenced to ten years in prison, of which he would have to serve at least seventy percent. He was appealing.[4] Appellant had undergone a second psychological evaluation by Dr. DeYoub. The results were poor; appellant had borderline intellectual functioning and a personality disorder. Dr. DeYoub was concerned because appellant had not made any progress over the last year, and in the last six months he had been incarcerated. Dr. DeYoub opined that if appellant had not been incarcerated and the children were placed with him, he would likely flee Arkansas and probably go to Texas. Dr. DeYoub did not recommend reunification but suggested drug screens if appellant were released. He summarized, "I thought at one point his prognosis was good, but this has changed over time with the demonstration that he has not done well." Appellant had also undergone a drug and alcohol assessment. DHS and the attorney ad litem for the children requested to move forward to termination. A formal motion was filed on March 19. The judge agreed, setting the termination hearing for May 22, 2001.

At this hearing, appellant argued that though he had not established paternity, he wanted more time to see how his appeal would be resolved and wanted DHS to provide additional services. Appellant had received services for six months. DHS resisted his request. DHS personnel testified that the children had been out of the home for approximately one and one-half years, they were together, and they had a high probability of being adopted together, but this would diminish as they got older. The judge terminated appellant's parental rights, noting among other things that reunification could not be accomplished in a reasonable period of time with his criminal conviction and incarceration.

---

[3] Appellant had undergone an earlier evaluation by the same psychological examiner in the first DHS case file opened with regard to Lovell III.

[4] Appellant's appeal, *Johnson v. State*, CACR01-682, is briefed in a no-merit form under submission with our court.

The judge also found that even without the incarceration, appellant could not be reunited with his children in a reasonable period of time. The judge found that appellant had not complied with the case plan or orders of the court, whereas DHS had complied with the orders and made reasonable efforts to deliver reunifications services. An order of termination followed, and this appeal resulted.

■ ■ When the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. *J.T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Wade v. Arkansas Dep't of Human Servs.*, 337 Ark. 353, 990 S.W.2d 509 (1999). Parental rights, however, will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.* The facts warranting termination of parental rights must be proven by clear and convincing evidence, and in reviewing the trial court's evaluation of the evidence, we will not reverse unless the court's finding of clear and convincing evidence is clearly erroneous. *Baker v. Arkansas Dep't of Human Servs.*, 340 Ark. 42, 8 S.W.3d 499 (2000). Clear and convincing evidence is that degree of proof which will produce in the fact finder a firm conviction regarding the allegation sought to be established. *Id.* In resolving the clearly erroneous question, we must give due regard to the opportunity of the trial court to judge the credibility of witnesses. *Id.* Additionally, we have noted that in matters involving the welfare of young children, we will give great weight to the trial judge's personal observations. *Ullom v. Arkansas Dep't of Human Servs.*, 340 Ark. 615, 12 S.W.3d 204 (2000).

■ An order forever terminating parental rights must be based upon clear and convincing evidence that the termination is in the best interests of the child, taking into consideration the likelihood that the child will be adopted and the potential harm caused by continuing contact with the parent. Ark. Code Ann. § 9-27-341(b)(3)(A) (Repl. 2002). In addition to determining the best interests of the child, the court must find clear and convincing evidence that circumstances exist that, according to the statute,

justify terminating parental rights. Ark. Code Ann. § 9-27-341(b)(3)(B) (Repl. 2002). One such set of circumstances that may support the termination of parental rights is that the child "has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the home and correct the conditions which caused removal, those conditions have not been remedied by the parent." Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) (Repl. 2002). It is not necessary that the twelve-month period out of the home be consecutive. Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(b) (Repl. 2002).

Appellant challenges only the finding that DHS provided meaningful effort to rehabilitate the home and correct the conditions that caused removal of the children. Appellant argues that this was not met when services were directed toward him for only six months and at best they could be delivered while he was incarcerated. We disagree that appellant has shown clear error.

The legislative intent of this section is found in Ark. Code Ann. § 9-27-341(a)(3) and is important to our inquiry:

> The intent of this section is to provide permanency in a juvenile's life in all instances where return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time, as viewed from the juvenile's perspective.

The mere fact that appellant was incarcerated at the time of the termination hearing is not dispositive of the termination issue. *See Crawford v. Dep't of Human Servs.*, 330 Ark. 152, 951 S.W.2d 310 (1997). However, our supreme court has stated that a parent's imprisonment does not toll a parent's responsibilities toward his or her children. *See Zgleszewski v. Zgleszewski*, 260 Ark. 629, 542 S.W.2d 765 (1976). The distinction is important: the trial judge did not terminate appellant's rights because he had been incarcerated; his parental rights were terminated because the statutory requirements for termination were met by clear and convincing evidence. The children had been adjudicated dependent-neglected; the children had been out of the home for more than

twelve months; DHS made a meaningful effort to rehabilitate the home and correct the conditions that caused removal; and despite that effort, appellant did not remedy those conditions.

 Undisputedly, the children's mother was consistently given services during the duration of this case until the mother's rights were terminated, including counseling, homemaker services, transportation, and housing referrals. . Appellant was absent much of the time that services were directed toward the family home. When appellant manifested interest in receiving services, he created the circumstances that made those services difficult to deliver. The statutory definition of "family services" found at Ark. Code Ann. § 9-27-303(23)(A) includes child care, homemaker services, counseling, cash assistance, transportation, therapy, psychological or psychiatric evaluations and treatment. Most, if not all, of these services were rendered to the family while this case file was open. Appellant himself has received a drug and alcohol assessment and a second psychological evaluation, and he has not suggested what services are lacking. The trial judge was not clearly erroneous in concluding that DHS made a meaningful effort to rehabilitate the home and correct the conditions that caused removal. We are not left with a distinct and firm conviction that a mistake has been committed.

 Moreover, in our de novo review, we could alternatively hold that grounds for termination were met under Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a), which provides:

> That, subsequent to the filing of the original petition for dependency-neglect, other factors or issues arose which demonstrate that return of the juvenile to the family home is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances which prevent the return of the juvenile to the family home.

Appellant's incarceration and ten-year sentence arose after the case file was initiated. Additionally, Dr. DeYoub's psychological evaluation changed from a good prognosis in his earlier report to an unfavorable one in his more recent one, and he observed that appellant was now displaying more antisocial traits. Furthermore,

appellant has never established paternity, despite orders to do so. The other biological parent is no longer a part of these children's lives because her parental rights have been terminated. With these facts, there is no family home to which to return the children, nor will there be one in the foreseeable future. These subsequent circumstances prevent the placement of the children in appellant's custody, in light of appellant's manifested incapacity or indifference to remedying the causes of the children's removal.

Affirmed.

BIRD, VAUGHT, and ROAF, JJ., agree.

HART and BAKER, JJ., dissent.

KAREN R. BAKER, Judge, dissenting. I would reverse finding that the failure to provide any services to the father within the twelve-month period when the children were in out-of-home placement fails to meet the statute's requirement that a meaningful effort be made by DHS to rehabilitate the home and correct the conditions that caused removal. Because the statutory prerequisites for termination of parental rights were not met, the State had no authority to terminate this father's rights.

The facts of this case make it clear that the conditions and circumstances that caused removal of these three children are related to poverty. The parents' second child was diagnosed with failure to thrive, caused by the parents feeding the infant watered-down formula. It takes no leap in logic to understand that parents with limited resources might water down formula to make it go further when feeding their child. In that case, DHS did provide services to the family. The condition that caused the removal was remedied and was not repeated with either the first child or the two subsequent children.

The second case the State filed concerning this family occurred when the parents found themselves without housing. The reason stated for the second case file being opened was that the father dropped the mother and his three sons off at a shelter "not telling the mother of his whereabouts." The abstract contains documents that indicate that when the family was asked to leave the motel in which they had been living, the mother con-

tacted DHS, and DHS told the family to go to the shelter. When the mother contacted DHS a second time, she was unable to say where the father was. Again, it is logical that a man looking for housing might not be able to provide an address or give information as to his specific location at any given time.

At the probable cause hearing held less than two weeks later, it was found that despite services rendered, the family had no means to support the children, and the State took custody of the children from their parents. Two months later at the adjudication hearing, the children were found to be dependent-neglected. While the majority states that this determination was "not due to poverty per se," there is no explanation of factors relied upon by the trial court or this court that establish the basis for the removal of these children except poverty. At the time of the adjudication hearing, both parents were living together in another motel.

By the time of the permanency planning hearing, both parents were still living together at yet another motel. This time, the mother was pregnant with the parents' fourth child. The judge asked her if she understood the cause of pregnancy and how to prevent it and emphasized that he had already taken away her other three children. Given this exchange, it is not surprising that the mother left the State of Arkansas with her unborn child before the next hearing. Until faced with the threat that she might lose yet another child to the State's custody, she had attended every hearing and worked with DHS in the receipt of services.

At the time DHS took these children away from their parents, the family had lived for years as a two-parent family. No allegations that the parents were abusive or that the children were in danger were ever made.[1] While living from motel to motel may not be the optimal living situation, the family had consistently lived from motel to motel. Although testimony revealed that the cost of motel rental was generally more than for other housing

---

[1] The majority footnotes that with one exception when the eldest child was removed from the foster home for a brief time, that the boys were reunited in the same foster home. It should be noted that the reason for the removal was abuse of the child while in foster care, in the custody of the State.

rental, nothing in the record explains why DHS's rental assistance failed to help stabilize the parents' living accomodations.

Throughout their life together as a family, the parents had never married and all three children were born out-of-wedlock. As the psychologist who performed the psychological evaluation of the father observed, if this man were given his children back (had he not been incarcerated) he would likely go to Texas. This is a logical conclusion given that the mother of these three children was in Texas with their fourth child and the two had consistently lived together with their children. Although the majority emphasizes throughout its opinion that the father had been ordered to establish his paternity, there is no dispute that this man consistently acknowledged these children as his family. Not only did he acknowledge them, he was the sole provider of support of these children without any state assistance at the time the children were removed from his custody. Despite this fact, the judge ordered that no reunification services be provided to him until he established paternity by some means other than his verbal claim to it.

The hearing for termination of parental rights was held on November 14, 2000. For the first time since the beginning of these proceedings, counsel was appointed for appellant.[2] At the hearing, the father argued that DHS had not made a meaningful effort to reunify him with his children because he had been provided absolutely no reunification services during the case. DHS conceded that the agency had not provided appellant with any reunification services. This concession was necessary since DHS was under court order to *not* provide any services to the father until he established his legal paternity.

First, the court ordered DHS not to provide services to the father. Then the court ordered DHS to provide services merely as a prerequisite to termination of his parental rights. Ordering that services be provided to the father, at that stage of the proceedings, was inherently contradictory to the requirement that a meaningful

---

[2] This hearing was also the first time that the mother of the children was represented by counsel, although she was not physically present. Counsel was appointed for the purpose of the termination proceeding and relieved upon its conclusion.

effort be made by DHS to rehabilitate the home and correct the conditions which caused removal.

Furthermore, the correlation between the father's failure to establish legal paternity to the children and the condition of his being unable to support his family and provide appropriate housing, eludes me. However, if it is so significant as to be a basis for terminating parental rights, then I must point out that once DHS was finally ordered to provide services to the father, DHS provided no services related to the court's order regarding paternity.

The majority offers an alternative grounds for termination based upon Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) citing the father's incarceration. The majority is careful to try to make the distinction that the trial judge did not terminate his parental rights because the father had been incarcerated, but because the statutory requirements for termination had been met. However, that section of the code also requires that DHS offer appropriate family services and that despite the offer of appropriate family services the parent has manifested incapacity or indifference.

The trial court's order precludes any such finding. On March 6, 2001, the court entered a permanency planning order in relation to the father alone that found that DHS had complied with the case plan, in that DHS "had made reasonable efforts to deliver reunification services. Specifically, the Department has offered a drug and alcohol assessment and a psychological evaluation." Testimony at trial indicated that the father completed both the drug and alcohol assessment and a psychological evaluation while incarcerated. The court then concluded that the father had not complied with the case plan or orders of the court. "Specifically, he has not received therapy nor has he participated in drug treatment. The Court realizes he has been incarcerated since the last hearing and not free to participate in these activities." Testimony of the DHS representative conceded that appellant was cooperative in relation to the offered services, but that some services were not offered because the representative was unfamiliar with the prison system and whether some services were available. Specifically, the representative stated that she thought that drug treatment had been available in other cases of incarceration, but

was not offered here. The court then relieved DHS from providing any further reunification services unless appellant obtained a lawful release from custody.

The father cooperated in every service offered. DHS conceded that failure to offer some services to that point fell upon DHS. Then the court, for a second time, relieved DHS from providing any services. Nothing could support the finding that the father manifested indifference or incapacity when the testimony presented by DHS established that he was cooperative and completed the services offered to him.

The facts of this case are disturbing, but the fact that it is not an isolated case makes reversal even more imperative. Trial judges have a duty to insist upon strict compliance with the statutory criteria before entering an order terminating parental rights. This "[i]nsistence upon strict compliance with the statutory criteria . . . enhances the child's best interests by promoting autonomous families and by reducing the dangers of arbitrary and biased decisions amounting to state intrusion disguised under the rubric of the child's best interests." *In re Danuael D.*, 724 A.2d 546, 553 (Conn. 1999)(citations omitted). Therefore, our adherence to strict compliance with our statutes is not merely a standard of review. *See Arkansas Dep't of Human Servs. v. Cox*, 349 Ark. 205, 82 S.W.3d 806 (2002) (finding DHS's conduct deeply disturbing when agency took custody of child utterly without authority and outside the limited circumstances set out in our state statutes). As one law journal notes, statistical data on neglect and children living in poverty show that "[s]tate governments appear to be destroying family ties of a large number of poor families with no concomitant benefit to children." *Second Chances: Insuring That Poor Families Remain Intact by Minimizing Socioeconomic Ramifications of Poverty*, 102 W. Va. L. Rev. 607, 613 (Spring 2000).

In this State, we require strict compliance with our statutes before destroying those family ties. That was not done here, and this case should be reversed.

Hart, J., joins.