Christina and Robert **RATLIFF**,
Appellants,

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
Appellee.

No. CA08–1060.

Court of Appeals of Arkansas.

Feb. 11, 2009.

Deborah R. Sallings, Arkansas Public Defender Comm'n, for appellant.

Tabitha Baertels McNulty, Office of Chief Counsel, for appellee.

Chrestman Group, PLLC, by: Keith L. Chrestman, attorney ad litem for the minor child.

KAREN R. BAKER, Judge.

Christina and Robert Ratliff appeal from an order terminating their parental rights in D.R. (born September 5, 1999). We affirm the termination order.

In July 2004, the Arkansas Department of Human Services (DHS) opened a protective-services case on the Ratliff family based on environmental neglect and inadequate supervision of their five sons. The Ratliffs separated shortly thereafter and the children remained with their mother, Christina. On October 13, 2004, DHS received a report that Christina was assessed for hospitalization due to mental instability and psychotic behavior. The next day, the three youngest boys, including five-year-old D.R., were seen walking to school in the rain along Highway 65. Christina explained to DHS that she had overslept and that she did not have time to take her prescribed medication. After reviewing the family's mental-health records and history of involvement with the Department, which included two prior protective-services cases, DHS placed a seventy-two-hour hold on all five children. The court granted emergency custody to DHS on October 18, 2004.

On December 7, 2004, the court adjudicated the children dependent-neglected based on Christina's stipulation that her mental illness and instability prevented her from appropriately parenting or supervising the children. The court noted that, in a prior attempt to fill out a background form, Christina had listed the children's father as Jesus Christ. Christina was ordered to take her medication, attend counseling, and visit the children. The court declared the oldest son emancipated and allowed DHS to investigate the Boys' Ranch in Harrison, Arkansas, as a possible placement for the other children. In a second adjudication order entered on March 8, 2005, after Robert was located and served, the court cited Robert's stipulation that the children were dependent neglected. The order implied that some of the children were then staying at the Boys' Ranch. Both adjudication orders established a goal of reunification.

In October 2005, the four unemancipated boys were placed with a paternal aunt in Ohio. Thereafter, the Ratliffs reconciled, obtained a home, and were repairing it in hopes of regaining custody. In June 2006, the aunt informed DHS that the placement was causing too much turmoil in her household and that D.R. had been very disruptive. The court allowed the children to return to Arkansas and authorized a thirty-day trial placement of the three oldest boys with their parents. D.R. was placed in therapeutic care.

On November 16, 2006, the court declared in a permanency-planning order that the three oldest boys had been successfully returned to their parents' custody. The court ruled that the parents had complied with the case plan and court orders, that they had made significant measurable progress toward achieving the goals established in the case plan, and that they had diligently worked toward reunification. The court maintained D.R. in DHS custody "due to his emotional instability and not the fault of the parents."

By the time the court entered its next order in June 2007, the second-oldest son was in the National Guard and would soon age out of the case. The court found that the middle sons, E.R. and M.R., had been suspended from school and had other behavioral and academic problems. On DHS's recommendation, the court returned E.R. and M.R. to the Boys' Ranch, although they remained in the legal custody of their parents. The court continued D.R. in DHS custody, finding that he needed "more supervision than the parents can provide at this time."

On October 31, 2007, the court entered a permanency-planning order that continued the goal of reunification as to D.R. and allowed the Ratliffs to retain custody of E.R. and M.R. so long as the children remained at the Boys' Ranch. The order stated that the parents had partially complied with the case plan and court orders but that Robert's work history had been extremely unstable and he was currently unemployed.

On January 17, 2008, the court changed the goal of the case to termination of parental rights and adoption as to D.R. The other two boys, E.R. and M.R., were ordered to remain in Robert's legal custody, so long as he kept them in treatment at the Boys' Ranch. The termination hearing was held on June 19, 2008, by which time D.R. was eight years old and had been out of the Ratliffs' home for over three and a half years.

At the hearing, DHS supervisor Nancy Graves testified that she had been involved with the Ratliff family since the first protective-services case was opened in 1999. She said that DHS had offered numerous, intensive services to the Ratliffs over the years and that, during the present case, she averaged four contacts a week with the family. She recommended termination of parental rights and adoption for D.R.

based on the Ratliffs' inability to provide for his needs and the child's need for permanency. Graves said that D.R. had been in the same therapeutic foster care home for two years and that he continued to improve when given the proper reinforcement. According to her, it was very doubtful the Ratliffs could provide the necessary reinforcement and structure for D.R., even though they loved him. She observed that Robert was disabled by poor health and had a sporadic work history, and she expressed concern about his ability to be D.R.'s sole parent if he should have to raise the child without Christina, whose mental illness was documented in the adjudication order. Graves also noted that the Ratliffs had been unable to control D.R.'s older brothers and that, as a result, the court remanded the brothers to the care of the Boys' Ranch. Graves testified that, if the brothers had not been placed at the Boys' Ranch, DHS would have taken them back into custody.

Graves also described the Ratliffs' unpredictable behavior during the case, stating that they would improve then "drop back down again." She characterized her relationship with them as "wonderful" at the moment but said that "it has not always been that way." She related an incident where Robert threatened her prior to a staffing, telling her, "You'd better get law enforcement over there, because I don't know what I'm going to do when I come in the door to you. And you need safety." She also noted that the boys' visit home in March 2006 turned problematic after Robert was arrested for intoxication and the terroristic threatening of a police officer.

Graves further said that DHS considered sending D.R. to the Boys' Ranch so he could be with his brothers. However, she determined that the Boys' Ranch would not be right for him because he

needed a consistent family environment. She said that D.R. had expressed his desire to be adopted and have a "regular home." According to Graves, adoption would most likely produce the best results for D.R., and he could stay in his current foster home until he was adopted. Graves additionally testified that the Ratliffs' unsupervised visits with D.R. in June 2006 did not go well, causing him to regress.

Therapist Dianne Martaus testified that D.R. needed permanency and that his emotional need for attachment would not be met in a setting like the Boys' Ranch. She concluded that a group-home environment would in fact be detrimental to D.R. According to Martaus, D.R. would be very successful in an adopted home and would fare better if parental rights were terminated. She also stated that D.R.'s visits with his parents created tremendous conflict for him.

Adoption specialist Don Mears testified that D.R. was adoptable. He also said that the Department would try to accommodate D.R.'s desire to continue to see his brothers.

Joan Shepard, D.R.'s counselor for two years, testified that the child had made considerable progress and had asked to be adopted. According to her, D.R. stated that, if he were returned to his parents, he would "be in therapy for the next 10 to 12 years." He also said, "my behavior would be so outrageous, that I'd be in therapy. I'd be so out of control." Shepard said that the boy was not coached in these statements. She also said that she could not envision D.R. at the Boys' Ranch and that he would "blossom" in an adoptive home.

Sheila Corder of Ozark Counseling testified that Christina had attended day treatment for two years. She said they worked on socialization and activities of daily living and that Corder said that she had seen a lot of social improvement in Christina. Corder said she had not worked with Christina on parenting.

DHS worker Heather Fendley testified that she had observed four face-to-face visits between D.R. and his parents and that D.R. was not very active during them. She further stated that "there was no participation of the parents with D.R. without encouragement from me." Fendley related a conversation she had with Robert about his ability to maintain a household, be a parent, and take care of Christina. According to her, Robert said that his health was poor and that he appreciated the Boys' Ranch because "he knew his wife couldn't care for the boys and he didn't feel that he'd always be there to care for the boys." Fendley additionally testified that D.R. was very adamant with her in stating that he needed a family.

D.R.'s foster father, Robert Robinson, testified that D.R. had greatly improved over the last two years due to a daily regimen. He said that D.R. had seen other foster children adopted and that he wanted to be adopted as well. According to Robinson, D.R. would prefer having a home and a secure family to remaining in foster care for another ten years.

At the close of the evidence, parents' counsel asked that the Ratliffs' parental rights not be terminated and that D.R. be placed at the Boys' Ranch. The court ruled that D.R. needed to be where he could attach to a family and have a lasting bond. The court therefore entered the termination order from which this appeal is taken.

Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Albright v. Ark. Dep't of Human Servs.*, 97 Ark.App. 277, 248 S.W.3d 498 (2007). However, courts are not to enforce parental rights to

the detriment or destruction of the health and well-being of a child. *Id.*

■ An order terminating parental rights must be based upon a finding by clear and convincing evidence that 1) termination of parental rights is in the best interest of the children, considering the likelihood that the children will be adopted if the parents' rights are terminated and the potential harm caused by returning the children to the parents' custody, and 2) at least one ground for termination exists. *See* Ark.Code Ann. § 9–27–341(b)(3)(A) and (B) (Repl.2008). We review termination-of-parental-rights cases de novo. *Lee v. Ark. Dep't of Human Servs.,* 102 Ark.App. 337, 285 S.W.3d 277 (2008). However, we will not reverse the circuit court's finding of clear and convincing evidence unless that finding is clearly erroneous. *See Albright, supra.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

In this appeal, the Ratliffs do not contest the circuit court's finding that termination was in D.R.'s best interest. They argue that the circuit court failed to specify a ground for termination and that there was insufficient evidence of a ground for termination. Their first assignment of error is based on an omission in the termination order. The order states as a ground for termination:

> The Court finds by clear and convincing evidence, that DHS has proven the grounds of the juvenile being out of the home for a period in excess of twelve months and the child cannot be returned to the custody of the parents and the child has been adjudicated dependent neglect. [sic]

The court was clearly attempting to cite the ground contained in Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(*a*) as a basis for termination, but neglected to recite the ground in its entirety. The statute reads:

> That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

The Ratliffs contend that the termination order is invalid because it contains no finding that the parents failed to remedy the conditions that caused removal. They further contend that there was no evidence of any conditions that they failed to remedy.

■ We need not address this argument because, in our de novo review, we may hold that other grounds for termination were proved, even when not stated in the circuit court's order. *See Smith v. Ark. Dep't of Health and Human Servs.,* 100 Ark.App. 74, 264 S.W.3d 559 (2007); *Johnson v. Ark. Dep't of Human Servs.,* 78 Ark.App. 112, 82 S.W.3d 183 (2002). In its petition to terminate parental rights, DHS pled the following as a ground for termination:

> That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.

Ark.Code Ann. § 9–27–341(b)(3)(B)(vii)(*a*) (Repl.2008).

Our review of the evidence convinces us that this ground warrants termination of the Ratliffs' parental rights. The evidence shows that, despite the many services provided to the Ratliffs since 2004, they are simply not capable of being reunified with D.R. *See generally Meriweather v. Ark. Dep't of Health and Human Servs.*, 98 Ark.App. 328, 255 S.W.3d 505 (2007) (recognizing that a termination order may be affirmed where the appellants are willing to try and be the parents that the child needs but are simply unable to do so). Here, Christina Ratliff stipulated in the adjudication order that her mental illness and instability prevented her from parenting or supervising the children. Her counselor testified that Christina had made social improvement, but she said that they had not worked on parenting. Robert virtually conceded Christina's inability to care for D.R., saying he knew his wife couldn't care for the boys, and he expressed doubt about his own capabilities, telling Heather Fendley that "he didn't feel that he'd always be there to care for the boys." Additionally, witness Nancy Graves recounted the Ratliffs' inability to sustain any improvements they made and noted their erratic behavior, including Robert's unstable work history and his making a violent threat to her.

The proof further reveals that, at some point, the Ratliffs lost their ability to function as parents in a household setting. During the case, they regained custody of their two middle sons but were unable to control them. As a result, the court ordered that the children be sent to the Boys' Ranch and remain there until they graduated. We believe it is telling that, at the termination hearing, the Ratliffs did not ask the circuit court to return D.R. to their home and their personal care; rather, they asked that he also be sent to the Boys' Ranch. The DHS witnesses were unanimous in their testimony that the Ranch was not a desirable placement for D.R., given his young age and his need for family attachment. It is even less desirable when we consider that D.R., like his brothers, might easily remain there until his education is complete, which, in his case, could be as much as ten years. To proceed as the Ratliffs suggest would afford them custody of D.R. in name only during the remainder of his childhood while denying him the opportunity to achieve permanency adoptive home.

We therefore conclude that the facts of this case demonstrate the Ratliffs have manifested an incapacity to remedy the factors that prevent D.R. from being returned to them. The intent of our termination statute is to provide permanency in a juvenile's life in all instances in which the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective. Ark.Code Ann. § 9–27–341(a)(3) (Repl.2008). D.R. has spent well over four years in foster care. To reverse a termination decision so that he might be placed in an institutional environment for which he is not suited, rather than be available for adoption, is contrary to that goal. We therefore affirm the termination of the Ratliffs' parental rights.

 The Ratliffs make a final argument that section 9–27–341(b)(3)(B)(vii)(*a*) is unconstitutionally vague in its use of the phrase "other factors and issues." For a statute to avoid being vague, it must give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden and it must not be so vague and standardless that it leaves judges free to decide, without any legally fixed standards, what is prohibited and what is not on a case-by-

case basis. *Thompson v. Ark. Social Services,* 282 Ark. 369, 669 S.W.2d 878 (1984). The law allows somewhat greater flexibility with regard to termination statutes because any parent should have some basic understanding of his obligations to his children. *See Davis v. Smith,* 266 Ark. 112, 583 S.W.2d 37 (1979). Flexibility and reasonable breadth in a statute, rather than meticulous specificity or great exactitude, are permissible so long as the statute's reach is clearly delineated in words of common understanding. *See id.* Impossible standards of specificity are not required, and a statute meets constitutional muster if the language used conveys sufficient warning when measured by common understanding and practice. *See id.* It is not necessary that all kinds of conduct falling within the reach of the statute be particularized. *Id.* Statutes are presumed constitutional, and the burden of proving otherwise is on the challenger of the statute. *Shipley, Inc. v. Long,* 359 Ark. 208, 195 S.W.3d 911 (2004). If it is possible to construe a statute as constitutional, we must do so. *Id.*

We decline to hold section 9–27–341(b)(3)(B)(vii)(*a* ) unconstitutional. Flexibility and breadth in the statute's language are necessary to allow for the myriad of factors and issues that could arise during a dependency-neglect case after the original petition is filed. Furthermore, the statute specifies that the other factors or issues must demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare. Additionally, there must be proof that the parents manifested an incapacity or indifference to remedy the subsequent issues or factors. Thus, neither DHS's nor the court's discretion is unfettered, and the statute does not allow a judge to operate without a fixed legal standard.

Affirmed.

GLADWIN and HENRY, JJ., agree.