2010 Ark. App. 353

**K.C., Minor Mother, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES and Minor Child, Appellees.**

**No. CA 09–1381.**

Court of Appeals of Arkansas.

April 28, 2010.

Rehearing Denied May 26, 2010.

Deborah Ruth Sallings, Arkansas Public Defender Commission, Little Rock, AR, for appellant.

Keith L. Chrestman, Chrestman Group, PLLC, Jonesboro, AR, Tabitha Baertels McNulty, Little Rock, AR, for appellee.

LARRY D. VAUGHT, Chief Judge.

In an order entered on September 23, 2009, the Circuit Court of Pulaski County terminated the parental rights of fifteen-year-old K.C. to L.C., her two-year-old child. K.C. appeals from the termination order, contending that the circuit court's findings were clearly erroneous. Specifically, she argues that there was a lack of evidence supporting the finding that termination was in L.C.'s best interests and the ground for termination. We agree and reverse and remand.[1]

Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Benedict v. Ark. Dep't of Human Servs.*, 96 Ark.App. 395, 397, 242 S.W.3d 305, 308 (2006). However, courts are not to enforce parental rights to the detriment or destruction of the health and well-being of a child. *Benedict*, 96 Ark.App. at 397, 242 S.W.3d at 308. A heavy burden is placed upon a party seeking to terminate the parental relationship, and the facts warranting termination must be proven by clear and convincing evidence. *Id.*, 242 S.W.3d at 308. We do not reverse the circuit court's finding of clear and convincing evidence unless that finding is clearly erroneous. *Id.*, 242 S.W.3d at 308. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*, 242 S.W.3d at 308. This, however, does not mean that the appellate court is to act as a "super factfinder," substituting its own judgment or second guessing the credibility determinations of the court; we only reverse in those cases where a definite mistake has occurred. *Id.*, 242 S.W.3d at 308.

On February 26, 2008, the Department of Human Services (DHS), exercised a seventy-two-hour hold on five children[2] of Brenda Green, one of whom was K.C. (born April 3, 1994). The hold also applied to L.C. (born December 7, 2007), who was Green's infant grandson and K.C.'s child. The children and grandchild were removed from Green and placed in DHS custody based upon a substantiated report that then thirteen-year-old K.C. had been sexually assaulted and impregnated by a twenty-three-year-old man who frequently visited the Green home. An ex parte order for emergency custody was granted by the circuit court on February 29, 2008. In a March 2008 hearing, the circuit court found that there was probable cause to believe that the emergency conditions that necessitated the removal of K.C. and L.C. continued; therefore, the circuit court ordered that they remain in DHS custody (placed in foster care together). An adjudication order was entered in April 2008, finding that K.C. was dependent neglected, that L.C. was a dependent juvenile, and that Green was an unfit mother. The court continued K.C. and L.C. in DHS custody and ordered K.C. to attend counseling, parenting classes, and school; submit to random drug screens; and obtain psychiatric and medical evaluations.

---

1. The circuit court also terminated the parental rights of L.C.'s father, Kendall Marshall. That disposition is not relevant to this appeal.

2. This opinion does not include in the factual summary the disposition of Green's other four children because it is not relevant to this appeal.

At an August 19, 2008 review hearing, the circuit court continued DHS custody of K.C. and L.C., but stated that the case plan was moving toward reunification with Green. A permanency planning hearing was held in January 2009, at which time the court continued K.C. and L.C. in DHS custody. The court noted that K.C.'s psychological evaluation demonstrated that she was mentally incapacitated; had very poor social functioning; had a great deal of social inadequacy; had significant problems with depression and self-esteem; and could not "take care of [her] baby without adult supervision[,] which she is receiving in foster care." Nevertheless, the court stated that L.C.'s goal was reunification with his mother. The court asked K.C. to "step up to the plate" by attending school, being a good student, and eliminating discipline problems.

A second permanency planning hearing was held in May 2009. The circuit court returned K.C. to the custody of Green. The court stated that this was not "the greatest situation" for K.C. but was "the best option for [her] at this time." It further stated that there appeared to be adequate support in the home for her and that given K.C.'s age, she was not likely to be adopted. Regarding L.C., the circuit court stated that compelling reasons did not exist to continue with the goal of reunification with K.C.; as such, the court changed the goal to termination of K.C.'s parental rights. Thereafter, DHS filed a termination petition. Citing Arkansas Code Annotated section 9–27–341(b)(3)(B)(i)(a), DHS alleged that L.C. had been adjudicated as a dependent juvenile; had been out of K.C.'s custody for twelve months; and that despite a meaningful effort by DHS to rehabilitate K.C. and correct the conditions that caused removal, those conditions had not been remedied by her.

At the termination hearing on August 18, 2009, DHS caseworker Danyetta Pride withdrew DHS's request for termination and instead sought reunification of L.C. and K.C., with the concurrent goal of permanent custody of K.C. and L.C. with foster parent, Cynthia Bibbs. Pride testified that K.C. complied with all court orders by attending counseling, parenting classes, and school. Pride stated that K.C. was managing her medications. According to Pride, since removal from Green's home, K.C. and L.C. had been together in Bibbs's home. Since May 2009, when K.C. was returned to Green's home, K.C. consistently attended supervised visitation with her son. According to Pride, the visits went well and L.C. and K.C. have a bond. Pride acknowledged that the psychological evaluation performed by Dr. Paul Deyoub in June 2008 concluded that K.C. suffered from mental deficiencies along with other disorders and that K.C. would require supervision while parenting. Pride conceded that K.C. could not care for L.C. by herself. Pride discussed K.C.'s fairly recent suspension from school for fighting and her admission into two different treatment hospitals for behavioral issues. Pride also stated that K.C. had taken medications that made her "act out," but that her medications had been changed with good results. Pride asked that the court not terminate K.C.'s parental rights, but instead permit her to live with L.C. and Bibbs so that she could continue to mature and learn to parent. Pride stated that K.C. understood that she required help to care for L.C. and that she was willing to accept help. Pride also reminded the court that the only reason L.C. was in DHS custody was because K.C. was placed in DHS custody and that there had been no allegations of abuse or neglect against K.C.

Adoption specialist Kasheena Walls testified that L.C. was adoptable. She noted

that L.C. had no special needs and that he was a normal, healthy boy. Specifically, she testified that twenty-five families matched L.C.'s characteristics of age, race, and sex.

Foster parent Bibbs testified that K.C. and L.C. entered her home in February 2008. She stated that she still had custody of L.C. but that K.C. returned to her mother's home in May 2009. Bibbs said that with supervision, K.C. was a very good mother to L.C. and was able to care for him. Bibbs noted that K.C. had some behavioral problems requiring treatment at Bridgeway Hospital and Pinnacle Pointe Hospital in the spring of 2009. Bibbs testified that K.C. fought at school, was hallucinating, and was cutting herself. Bibbs also mentioned that doctors at Pinnacle Pointe changed K.C.'s medications and that K.C. had been compliant since that time. Bibbs also testified that after K.C. returned to her mother's home, K.C. regularly attended supervised visitation with her son. Bibbs stated that L.C. was very happy to see K.C. during visitations and that they had bonded as mother and child. Bibbs said that she was willing to continue to foster K.C. and L.C. until K.C. reached the age of majority. Bibbs thought that this would be best for L.C. because he loved his mother. Bibbs stated that she thought it would be "tragic" to take L.C. from his mom and that he asked for her when she was not around. However, if termination was the ultimate decision, she stated that she would be willing to adopt L.C.

K.C.'s mother, Green, testified that she wanted K.C. to keep her son if that meant that they both lived with Bibbs. She thought it would be beneficial for Bibbs to supervise K.C.'s care of her son. Green confirmed that K.C. had fairly recent behavioral problems and had juvenile-delinquency charges pending against her.

K.C., who was fifteen at the time of the hearing, testified that she wanted to live with Bibbs and L.C. so that she could raise her son. She said that she had complied with all of DHS's requests. She also stated that if she could not have L.C., she wanted Bibbs to adopt him.

At the conclusion of the hearing, DHS reiterated its position that termination was not appropriate and that K.C. should be given three months to see if her positive behavior continued. The attorney ad litem (AAL) for L.C. pressed for termination, pointing to Dr. Deyoub's evaluation and arguing that K.C.'s mental-health issues would always exist. He argued that L.C. was a baby who had a "chance at life," but he would have no chance if raised by K.C.—a parent who was "inadequate and [would] always be inadequate" because there was nothing she could do to remedy her condition. The AAL then argued that grounds for termination had been established because L.C. had been in foster care for more than twelve months and that it was in the best interests of L.C. to be adopted.

From the bench, the circuit court terminated K.C.'s parental rights to L.C. The court found that L.C. had been in foster care for over a year. It found that everyone agreed that K.C. was not ready to parent L.C. by herself, and it could not point to any compelling reasons to give K.C. additional time to prove that she could parent alone. The court questioned whether K.C. was complying with court orders because she had been hospitalized for bad behavior and instability a few months prior. Assuming compliance, the court stated that this alone was not sufficient to avoid termination where the deficiencies had not been remedied. The court found K.C. to be an insufficient parent, and it refused to return L.C. to K.C. with the contingency that another person

supervise them. After summarizing the long history it had with Green and her children, the court identified one of the main issues as whether K.C., based on her mental deficiency, would ever be a "minimally qualified parent." The court then concluded that it could not see reunification within a reasonable time, and it believed waiting three more years until K.C. was eighteen was too long for L.C. to wait. The court noted that L.C. was an adoptable child and that it was in his best interests to be adopted.

After the formal termination order was entered, K.C. timely appealed. She argues that the circuit court clearly erred in terminating her parental rights and that the order must be reversed. DHS also argues that the circuit court's ruling was clearly erroneous. The AAL argues that the circuit court's decision should be affirmed.

■ An order terminating parental rights must be based upon a finding by clear and convincing evidence that termination of a parent's rights is in the best interest of the children, considering the likelihood that the children will be adopted if the parent's rights are terminated *and* the potential harm caused by returning the children to the custody of the |₈parent. Ark.Code Ann. § 9–27–341(b)(3)(A) (Repl. 2009) (emphasis added). Here, the circuit court's termination order found that it was "contrary to [L.C.'s] best interests, health and safety, and welfare to return him to the parental care and custody of [K.C.]." The court further stated that, "[i]t is in [L.C.'s] best interests for him to be placed into a permanent home, and he is an adoptable child. It is [in L.C.'s] best interests to terminate parental rights." The only finding made by the court to support the best-interest element was that L.C. was adoptable. There were no findings, and there is no evidence in the record, that

potential harm would be caused by returning L.C. to K.C. While the court voiced significant concern over K.C.'s mental deficiencies and her lack of maturity, there was no evidence introduced demonstrating that these concerns posed potential harm to L.C. There was no evidence that K.C. abused or neglected L.C. The evidence on this issue is to the contrary. According to Bibbs and Pride, with supervision, K.C. cared for her son as any mother would, and when K.C. left Bibbs's home, K.C. attended all visitation, which according to all parties went very well. Based on this record, there is no evidence supporting the required consideration of potential harm.

The AAL argues that the evidence supports the best-interest finding made by the circuit court because K.C. lacks the mental capacity to parent L.C. and that additional time or services will not change that. He points to testimony from several witnesses who stated that K.C. was unable to parent her son without supervision and also to Dr. Deyoub's report finding that K.C. is unfit "by reason of her mental retardation, immaturity, depression, low self-esteem, and lack of judgment." Clearly, the trial court agreed with this position because|₉all of its best-interests findings (except for the finding of adoptability) revolved around its belief that K.C. was unable to care for her son because of her mental deficiencies.

We agree that there are some questions in this case about K.C.'s mental capacity to care for L.C. There is also evidence that K.C. had delinquency proceedings pending against her, had gotten into a fight at school, and had acted out in other ways. However, these findings do not support the required best-interests consideration of potential harm. There is no evidence in the record that K.C. had caused potential harm to her son. In fact, the evidence was undisputed that K.C. was a good caregiver

to her child and that they had a mother-child bond. As such, we hold that the circuit court clearly erred in finding that termination was in L.C.'s best interests.

Not only is evidence supporting the best-interest element lacking in this case, there is a lack of evidence supporting the ground for termination upon which the circuit court relied. The circuit court's termination order provided:

> [I]t has been proven by clear and convincing evidence that the juvenile has been adjudicated by the court to be dependent and has continued out of the custody of the parent in excess of twelve months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

Although the court did not expressly state the precise code provisions upon which it relied in its order, the language in the order reflects that the court relied upon the ground set forth in Arkansas Code Annotated section 9–27–341(b)(3)(B)(i)(a), which provides:

> That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

This particular ground requires that (1) the child be adjudicated dependent-neglected, (2) the child be out of the custody of the parent for twelve months, and (3) the parent failed to remedy the conditions that caused the child's removal.

K.C. and DHS argue that all three of these elements have not been met. First, K.C. contends that the record does not establish that L.C. was adjudicated dependent neglected.[3] While there was no finding that L.C. was dependent neglected, the circuit court did find him to be a dependent juvenile. A "dependent juvenile" is defined as "[a] child of a parent who is in the custody of the department." Ark.Code Ann. § 9–27–303(17)(A) (Repl. 2009). L.C. meets this definition because his mother was in the custody of the department. Moreover, section 9–27–303(18)(B) (Repl.2009), specifically provides that a " '[d]ependent-neglected juvenile' includes dependent juveniles." Therefore, L.C. also falls within the definition of a dependent-neglected juvenile.

K.C. acknowledges that the definition of "dependent-neglected juvenile" includes a "dependent" child, yet she claims that is a "logical fallacy" and inconsistent with legislative intent. She also argues that our court, in *Moiser v. Arkansas Department of Human Services*, 95 Ark.App. 32, 233 S.W.3d 172 (2006), recognized the important distinction between the two terms. We disagree. The clear and unambiguous language of the statute expresses that a dependent-neglected juvenile includes a dependent juvenile. Further, in *Moiser*, we did not hold that the definition of a dependent-neglected child did not include a dependent child. Rather, we held that the facts in that case did not support the trial court's conclusion of dependent neglect based on a finding that the child was dependent. *Moiser*, 95 Ark.App. at 36, 233 S.W.3d at 175 (reversing and remanding termination decision based on finding of dependency, where substantial evidence demonstrated that relatives were willing to care for a child, whose sole custodial par-

---

**3.** DHS concedes that this element has been established based upon a strict construction of Arkansas Code Annotated section 9–27–303(18)(B).

ent had been incarcerated). We therefore hold that the circuit court was not clearly erroneous in concluding that the first element of section 9–27–341(b)(3)(B)(i)(a) was satisfied.

Next, K.C. and DHS argue that L.C. was not out of K.C.'s custody for twelve months. While it is true that K.C. was only separated from L.C. three months prior to the termination hearing, the facts are undisputed that L.C. was not in K.C.'s custody during that time. Rather, L.C. was in DHS custody and continued to be in DHS custody in excess of twelve months. As such, the second element of section 9–27–341(b)(3)(B)(i)(a) is also satisfied.

Finally, both K.C. and DHS argue that the third element of section 9–27–341(b)(3)(B)(i)(a)—that the parent has not remedied the conditions that caused removal—is not satisfied. We agree. In concluding that there was evidence to support this element, it appears the circuit court may have blurred the lines between Green's case and K.C.'s case and wrongly applied facts from Green's case to support its termination decision in K.C.'s case. At the termination hearing when the circuit court was explaining its findings, it stated, "Now we're talking about what to do with this baby. This baby has a chance. I don't believe this baby would have a chance in Ms. Green's home because she still has—I never would have returned any young children to Ms. Green's home. Let's assume that's our mindset." Clearly, the court did not think that Green had remedied the problems that caused the removal of L.C. However, this was not a case where termination of Green's rights to L.C. was being sought. This was a hearing seeking to terminate K.C.'s rights to her son. In this case, it was impossible for K.C. to remedy the problems that caused removal because she was not the cause of the removal of L.C. The record is completely void of any evidence as it relates to K.C. on this required element.

The AAL fails to respond to any of the subsection (b)(3)(B)(i)(a) arguments made by K.C. and DHS. Instead, the AAL asks that this case be affirmed based upon an entirely different ground—subsection (b)(3)(B)(vii)—which provides that termination shall be based upon a finding

> (a) [t]hat other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.
>
> . . .
>
> (c) For purposes of this subdivision (b)(3)(B)(vii), the inability or incapacity to remedy or rehabilitate includes, but is not limited to, mental illness, emotional illness, or mental deficiencies. . . .

Ark.Code Ann. § 9–27–341(b)(3)(B)(vii)(a), (c) (Repl.2009).

We can affirm based upon our de novo review and ability to hold that other grounds for termination were proved even when they were not stated in the circuit court's order. This is the request of the AAL, and he cites several cases in support of his request: *Ratliff v. Ark. Dep't of Human Servs.*, 104 Ark.App. 355, 292 S.W.3d 870 (2009); *Smith v. Ark. Dep't of Health & Human Servs.*, 100 Ark.App. 74, 264 S.W.3d 559 (2007); and *Johnson v. Ark. Dep't of Human Servs.*, 78 Ark.App. 112, 82 S.W.3d 183 (2002).

However, in this instance we elect not to accommodate the AAL's request. This particular ground was not alleged in the termination petition, it was not argued at the termination hearing, and the trial court did not base its termination decision upon it. At no time did the AAL seek to amend the termination petition to add this ground. This ground is being argued for the first time on appeal. These facts are distinguishable from the facts in the cases cited by the AAL on this point. For instance, in *Ratliff* and *Smith*, the "other ground" was alleged in the termination petition. *Ratliff*, 104 Ark.App. at 361, 292 S.W.3d at 875; *Smith*, 100 Ark.App. at 77, 264 S.W.3d at 562. In *Johnson*, our court upheld the ground that the trial court relied upon and alternatively held that "other grounds" were also present to support the termination. *Johnson*, 78 Ark.App. at 121, 82 S.W.3d at 188–89. Therefore, our court did not pull a new ground out of thin air and rely upon it as the sole basis to affirm the termination of parental rights.

Moreover, affirming this case based on section § 9–27–341(b)(3)(B)(vii)(a) would result in a violation of K.C.'s due-process rights. Our supreme court has extended to proceedings involving the termination of parental rights many of the same Fourteenth Amendment due-process safeguards as have been found to be constitutionally mandated in criminal trials. *Clemmerson v. Ark. Dep't of Human Servs.*, 102 Ark. App. 1, 4, 279 S.W.3d 484, 487 (2008) (citing *Jones v. Ark. Dep't of Human Servs.*, 361 Ark. 164, 205 S.W.3d 778 (2005)). Due process requires, at a minimum, notice reasonably calculated to afford a natural parent the opportunity to be heard prior to terminating his or her parental rights. *Kight v. Ark. Dep't of Human Servs.*, 94 Ark.App. 400, 409, 231 S.W.3d 103, 109 (2006) (citation omitted).

Here, K.C. had no notice that her parental rights might be terminated based upon her mental deficiencies. As such, she had no opportunity to present testimony (lay person and/or expert) to the contrary. The only medical evidence in the record on this issue was Dr. Deyoub's report, which was fourteen months old at the time of the termination hearing. And while there was evidence that K.C. was mentally deficient, there was also evidence of her ability to write, attend school and parenting classes, and care for her son. This ground was not alleged in the termination petition and the circuit court did not terminate K.C.'s rights based on this ground. Our court—in order to affirm on this ground that was not raised below—would be forced to answer the questions: *How* mentally challenged is K.C., and *how* would that affect her abilities as a parent? Essentially, we would be weighing the evidence and making factual findings on the issue of K.C.'s mental abilities. Appellate courts do not make findings of fact but rather review findings of fact of the circuit court to determine whether they are clearly erroneous. *Ward v. Williams*, 354 Ark. 168, 177, 118 S.W.3d 513, 518 (2003) (citing Arkansas Rule of Civil Procedure 52(a) and stating that "it is radiantly clear that appellate courts do not make findings of fact but rather review findings of fact of the circuit court to determine whether they are clearly erroneous"); *Harris v. State*, 98 Ark.App. 264, 268, 254 S.W.3d 789, 792 (2007). If the AAL believed that K.C.'s parental rights should have been terminated pursuant to section 9–27–341(b)(3)(B)(vii)(a), it should have been alleged and developed below. We will not affirm the termination of parental rights based upon a ground that was not alleged, not relied upon by the circuit court, and lacks factual findings.

Based on the foregoing, we hold that the circuit court clearly erred in finding that termination was in L.C.'s best interests and that the ground for termination pursuant to Arkansas Code Annotated section 9–27–341(b)(3)(B)(i)(a) was proven by clear and convincing evidence.

Reversed and remanded.

GLOVER, J., agrees.

GRUBER, J., concurs.

GRUBER, J., concurring.

While I agree with the result in this case for the reasons explained by the majority, I cannot agree that the time added by this opinion to L.C.'s continued foster care is in L.C.'s best interest. The intent of the legislature in authorizing termination of parental rights is to "to provide permanency in a juvenile's life in all instances in which the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective." Ark.Code Ann. § 9–27–341 (Supp.2009). In making the determination whether to terminate a parent's rights, the court's focus is on the best interest of the juvenile. *See* Ark.Code Ann. § 9–27–341(b)(3)(A). Looking solely at this standard, I would vote to affirm this case. A proper review of this case, however, requires that we look not only at L.C.'s best interest but also at the grounds for termination. Ark.Code Ann. § 9–27–341(b)(3)(B).

The evidence as detailed in the majority opinion did not support the ground for termination found by the circuit court and no other ground was sufficiently alleged and developed. Thus, we cannot affirm the circuit court's order. Because our reversal in this case has, in my view, thwarted the legislature's intent and prolonged much-needed permanency in L.C.'s life, I urge the circuit courts to do their best to make all of the necessary findings for termination in their orders and trial counsel to allege all appropriate grounds. This court cannot make findings but can only affirm findings made by the circuit courts. Likewise, the appellate court cannot create grounds that were not pleaded or proven at a termination hearing, particularly when the due process rights of a fifteen-year-old mother are at stake.